William M. KRONENBERG, III, Frank A. Piliero, David M. Rosenberg, and Community Sports Partners, II, LLC, Plaintiffs,

v.

Samuel P. KATZ, and Community Sports Partners, LLC, Defendants.

Samuel P. Katz, and Community Sports Partners, LLC, Counterclaim Plaintiffs,

and

Entersport Capital Advisors, Inc., Additional Counterclaim Plaintiff,

v.

William M. Kronenberg, III, Frank A. Piliero, David M. Rosenberg, and Community Sports Partners, II, LLC, Counterclaim Defendants.

C.A. No. 19964.

Court of Chancery of Delaware, New Castle County.

Submitted: April 23, 2004.
Decided: May 19, 2004.

David C. McBride, Esquire, Martin S. Lessner, Esquire, Jessica S. Davis, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, Attorneys for the Plaintiffs.

Gregory V. Varallo, Esquire, C. Malcolm Cochran, IV, Esquire; Kelly A. Green, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware, Attorneys for the Defendants, Counterclaim Plaintiffs.

## *OPINION*

STRINE, Vice Chancellor.

Defendant Samuel Katz met plaintiff William Kronenberg in the late 1990s. Kronenberg admired Katz and became a large contributor to Katz's campaign for Mayor of Philadelphia. Eventually, Katz and Kronenberg discussed going into business together. At that time, Katz had businesses—EnterSport Capital Advisors, Inc. ("EnterSport") and American Skating, LLC—that were focused on making money through the stimulation of the construction of community sports facilities such as ice skating rinks. The basic idea was to get communities to fund the construction and for Katz's business entities to operate the facilities, which would be available for use by youth and adult sports leagues and parents wanting to hold birthday parties.

Katz wanted Kronenberg and some of Kronenberg's business associates, plaintiffs Frank Piliero and David Rosenberg, to invest in this business concept through a successor to American Skating. In promoting this idea, Katz knew that Kronenberg was taking the lead for Piliero and Rosenberg and encouraged Kronenberg to share information with them.

During the course of these discussions, Katz highlighted the importance of obtaining independent feasibility studies regarding the viability of certain sports facilities the business would be seeking to develop. One of the reasons the feasibility studies were important was that the business intended for governmental authorities to fund the construction of the sports facilities through the issuance of bonds. The existence of a study—prepared by an independent, credible industry expert—verifying that the projected revenues from the facilities would be sufficient to repay the bonds needed to finance construction was therefore very important.

Another premise of Katz's idea was that he and his existing complement of employees would manage the new venture through EnterSport—which would be the actual co-member of the LLC that was to

succeed American Skating, with Kronenberg and the other plaintiffs acting largely as equity investors in the successor LLC who would put up all of the cash equity. In particular, Katz's employee, Mark Robins, was to be a key executive in the venture, acting as the principal operating officer. Katz told Kronenberg and the other plaintiffs good things about Robins and Robins's track record in the industry.

Eventually, Katz's discussions with Kronenberg, Rosenberg, and Piliero led to an agreement, which was formalized in a contract to form defendant Community Sports Partners, LLC. Katz was not a party to the "LLC Agreement" but his entity, counterclaim-plaintiff EnterSport, was. Each of the plaintiffs signed the LLC Agreement and collectively initially invested $2.1 million in Community Sports Partners ("CSP"). Mark Robins became CSP's Chief Operating Officer.

Within two years of the signing of the LLC Agreement, CSP had burned through most of the cash the plaintiffs had invested and it was revealed that Robins had diverted several hundred thousand dollars of CSP's funds to himself. This led to heated discussions among Katz and the plaintiffs. Eventually, this suit was filed.

In this suit, plaintiffs Kronenberg, Rosenberg, and Piliero seek, among other things, rescission of their agreement to invest in CSP. Their basic reasons are twofold.

First, they allege that the so-called "independent feasibility studies" they were shown when considering whether to invest were not what they purported to be. Rather than being authored by the purportedly independent consultant that supposedly produced the studies, the studies were in fact mostly written by Robins and Katz. Indeed, as to one of the studies shown to the plaintiffs, it appears that the entire study was written by Robins and Katz with no involvement by the third-party consultant. As to another study in which the third party was involved to some extent, the evidence is undisputed that the study was primarily drafted by Robins and Katz, who in fact worked as sub-contractors to draft the study—a fact never revealed to the plaintiffs or other recipients of the study. Indeed, the supposedly independent third party was in fact a party that hoped to be a co-venturer of Katz's and was not being paid like a genuine independent consultant. By any standard, all of the studies were not what they were purported to be—feasibility studies drafted by an independent expert. Rather, they were crafted by Katz and Robins themselves and labeled as having been drafted by a third party. In any academic community, the studies would be considered plagiarism if presented by the third party as its own work product.

In addition, after Robins was found to have diverted funds, it was discovered that he had a long and colorful past, which included numerous criminal convictions and personal bankruptcies, in which he had left even members of his family as unsatisfied creditors. None of this colorful history had been disclosed by either Katz or Robins in the negotiations leading to the LLC Agreement. Instead, Katz presented Robins as a trusted employee with a solid history of industry experience.

The plaintiffs allege that they never would have invested in CSP had they known that the independent feasibility studies were in fact prepared by Robins and Katz, and had they known that Robins was a person with a lengthy criminal record. They seek summary judgment because they contend that the discovery record reveals that there is no material dispute of fact regarding the reasonableness of their reliance on Katz's contrary (or, at the very least, materially mislead-

ing) assurances. Under Delaware principles of common law and equitable fraud—and analogous principles of Pennsylvania law—as well as the Pennsylvania Securities Act of 1972 (the "Pennsylvania Securities Act" or "Pennsylvania Act"),[1] the plaintiffs contend that Katz's misleading representations in connection with their investment decision are sufficient to sustain their demand for rescission, regardless of whether Katz knew he was misleading the plaintiffs.

Katz responds to this motion for summary judgment primarily by claiming that a standard integration clause in the LLC Agreement precluded the plaintiffs from reasonably relying upon any statements made by him that were not incorporated within the LLC Agreement itself. Relying on this argument, Katz and his co-defendant CSP themselves seek summary judgment on the plaintiffs' rescission claims.

In this opinion, I grant the plaintiffs' motion for summary judgment on their fraud in the inducement and Pennsylvania Securities Act claims. The independent feasibility studies were, as Katz himself represented, very important to the CSP business concept. CSP had to promote facilities to public officials, for whom the existence of an independent feasibility study would be important in deciding whether to put the public's finances at risk. The fact that the independent feasibility studies were not what they on their face purported to be was obviously material to any reasonable investor considering putting money into CSP and was, on this record, material to the plaintiffs. Had the plaintiffs known that Katz and Robins were, in reality, the primary authors of one of the feasibility studies and the sole

authors of another of the feasibility studies, they would never have invested.[2] Among the obvious reasons this is so is this one: the presentation of such a feasibility study to a public official could expose the presenter to criminal liability for intentionally making a false statement to a public authority.

As to Robins, Katz himself admits that no reasonable person would have invested in CSP knowing of Robins's background. The business premise of CSP depended on credibility. The idea that prospective investors would proceed to put millions of dollars at risk after being told that the COO of the entity and a primary communicator with public authorities would be a person with a criminal record (including felony convictions of recent vintage) who was not forthcoming about his background is impossible to credit. Here, Katz told the plaintiffs orally and in writing things about Robins that led them to believe that Robins was a capable and experienced executive in whom Katz reposed confidence. What Katz never disclosed was Robins's true background, which, to put it mildly, is confidence-shattering and materially inconsistent with Katz's description of him, regardless of whether Katz knew of the true facts.

In view of these and other factors, I have little difficulty in concluding that the plaintiffs would not have invested in CSP had they known the true facts regarding either the independent feasibility studies or Robins.

The more difficult question this opinion addresses is whether the standard integration clause in the LLC Agreement precluded the plaintiffs from reasonably rely-

---

1. Pa. Stat. Ann. tit. 70, §§ 1–101 to 1–704.

2. As will be seen later, none of the feasibility studies relevant to this case were ever written by a third party. All of them were predominantly written by Robins and Katz, with little or no involvement by the putative third-party author.

ing on Katz's statements regarding these issues, because those statements were not reflected as representations in the LLC Agreement. I conclude that the integration clause in the LLC Agreement does not preclude the plaintiffs' claims here because it cannot be unambiguously read as an anti-reliance clause, which would constitute an affirmative contractual agreement that the parties to the underlying contract were not relying on any extra-contractual statements of fact in deciding to contract. Because the governing law of both states whose law is relevant to this dispute—Delaware and Pennsylvania—is chary about permitting contracts to bar fraud claims, contractual provisions cannot preclude reasonable reliance unless they constitute, when taken together, a clear promise by the plaintiffs that they were relying only on the representations in the contract itself and were not relying on any statement outside the four corners of the agreement. This conclusion is also buttressed by a consideration of relevant authorities, which suggest that standard integration clauses generally do not preclude fraud in the inducement claims. For this and other reasons, I therefore grant the plaintiffs' motion for summary judgment on their fraud and Pennsylvania Securities Act claims and deny the defendants' cross-motions on those claims.

Later in the opinion, I address claims by defendant Katz and counterclaim-plaintiff EnterSport that the plaintiffs breached the LLC Agreement by filing this lawsuit without seeking to place it under seal. For reasons I explain later, I grant the plaintiffs' motion for summary judgment against these claims. At worst, Katz and EnterSport faced the public revelation of the complaint in this case a few weeks before it would have otherwise become public. At no time during the course of this litigation has Katz or EnterSport pointed to specific portions of the record

that contain specific proprietary information or sensitive personal information that would justify sealing particular portions of the record, much less indicated how the mere fact of this business dispute itself can be concealed from the public. Because of the constitutional and common law requirements of open access—which are reflected in this court's Rule of Civil Procedure 5(g)—Katz and EnterSport could never have convinced the court to keep this dispute secret. As a result, their claim for damages is purely speculative and cannot be sustained.

### Introduction

A bewildering forest of paper has been filed in connection with these summary judgment motions. After the dizziness dissipated, I was able to discern a core set of undisputed facts. For clarity's sake, I divide my factual discussion into two basic parts. In the pages that follow, I address the undisputed facts relevant to the disposition of the plaintiffs' claims for rescission. Those claims center on the argument that the plaintiffs should receive back the $2.1 million they invested in CSP because their investment in that company was induced by material misrepresentations. The plaintiffs advance that argument under two legal rubrics: the common law of fraud of both Delaware and Pennsylvania and the Pennsylvania Securities Act. The facts underlying those separate claims are identical. Once those facts are identified, I will proceed to address the legal arguments made by the parties regarding those claims. For their part, the plaintiffs argue that the undisputed facts warrant the entry of summary judgment for them on these claims. By contrast, defendants Katz and CSP contend that summary judgment should be entered for them on these claims because these claims lack legal vitality.

In later sections of the opinion, I address Katz and EnterSport's claim that the plaintiffs breached the CSP LLC Agreement by filing this lawsuit without seeking a judicial order placing the complaint under seal. Katz and EnterSport argue that this filing breached the plain language of the LLC Agreement and caused them cognizable injury. They seek summary judgment on the liability aspect of this claim. Meanwhile, the plaintiffs argue that Katz is not even a signatory to the LLC Agreement and is not a third-party beneficiary of the provision of the contract that relates to the confidentiality of disputes among the LLC's members— § 14.1, the "Confidentiality Provision." Furthermore, the plaintiffs argue that Katz and EnterSport are unable to point to any cognizable injury they suffered because nothing in the complaint involved the kind of proprietary information that Delaware courts will shield from public scrutiny, given the strong presumption in favor of openness governing evidence and other filings submitted in lawsuits in Delaware courts. Later in this opinion, I identify the relevant facts bearing on these arguments and resolve the parties' contending positions.

I. *The Plaintiffs' Claims For Rescission Of Their Investment In CSP*

A. *Factual Background*

With that roadmap in mind, I now set forth the undisputed facts that bear on the plaintiffs' claim for rescission of their investment. I will intentionally do this at some level of generality, to stress what is most relevant and to avoid burdening the reader with the parties' jousting over subsidiary, immaterial matters.

*Katz (Unwittingly) Teams With A Convicted Felon To Pursue Business Opportunities Involving Community Sports Facilities*

The basic storyline is relatively simple. In the late 1990s, defendant Sam Katz was involved in several activities. These included an ongoing pursuit of the Mayoralty of Philadelphia and certain business interests. The business interests included his ownership of a business focused on making profits from the sports industry. In particular, Katz was interested in facilitating the construction of sports facilities—such as skating rinks—from which profits could be extracted in the form of management fees. These facilities were designed to provide recreational opportunities for community members while yielding profits from the cash flow resulting from charges for ice time, concessions, birthday parties, and the like.

Katz employed Mark Robins as a key executive in the pursuit of this business. Robins worked with a very small group of other employees of Katz-controlled entities to advance this business concept.

Katz happened upon Robins through a business colleague and did not perform any inquiry into Robins's employment history or educational background. As it later turned out, this was a rather serious mistake. Had Katz checked, he would have found that during periods when Robins later claimed to have been productively working in the private sectors, he had, among other things:

· Been convicted of attempting to smuggle 400 pounds of marijuana into the United States in 1974;

· Been convicted of armed robbery in 1977;

· Been convicted of receiving stolen property in 1984;

· Been convicted of aggravated assault in 1987;

· Been convicted of stealing $100,000 in furniture from his uncle in 1987; and

· Filed twice for personal bankruptcy, and in connection with those filings, left even his own mother out of pocket to the tune of hundreds of thousands of dollars.

By 1997, Katz formed counterclaim-plaintiff EnterSport to pursue the community ice skating rink concept by providing consulting and advisory services to the industry. A short time later, Katz formed American Skating, LLC to develop and manage ice skating rinks. Robins was Katz's key subordinate for both operations and Katz kept in close touch with Robins about these endeavors.

*Katz Formulates A Business Strategy Involving The Development Of Community Sports Facilities With Bonds Issued by Government Agencies*

In 1998, Katz considered combining his ice skating interests with those of Jack Vivian. Vivian is a specialist in the ice skating rink business, who both manages rinks himself and provides advice to others about how to run them profitably. Vivian has both an ice hockey and an academic background, and brings to the rink both academic training, in the form of managerial theory, and practical experience, in helping to operate skating rinks.

Together, Katz and Vivian hoped to form a business to develop a series of new skating rinks, with Vivian wishing to have the Midwest "franchise," so to speak, and with Katz focusing on the East. Neither Katz nor Vivian had an interest (or perhaps even the capability) of putting up sufficient capital of their own to develop rinks themselves. When a third-party investor could not be found, Katz and Vivian put their merger talks on the back burner but continued to see whether their vision could be pursued in another way.

Specifically, Katz turned towards the idea of forming tax-exempt community organizations to actually finance and own the skating rinks, using the tax-exempt bond financing authority of local governments. Katz believed that there would be profit to be had in stimulating the construction of municipally and county-owned skating rinks, because his firm could reap fees for managing the development and construction phase and thereafter receive ongoing fees to manage the facilities. One component of the success of this idea was its replicability—namely, that Katz could foster the development of a sufficient number of these rinks to make it worth his while. Because of the tax-exempt approach, there were limits on the profits that could be obtained from any particular rink. Therefore, the key was to develop a good approach that could be replicated in various communities, generating an overall return for Katz's entities that was healthy.

Katz claims that he had ruled out any joint venture with Vivian to accomplish these ends. Vivian, however, viewed things differently. He saw himself as having a claim on the Midwest territory to implement this vision. That is, Vivian believed that once Katz had shown that the concept would work on the East Coast, Vivian would pick it up in the Midwest and/or have his management company manage some or all of the East Coast rinks. In particular, Vivian contends that Robins led him to harbor this expectation. Katz distances himself from Vivian's story but did not know whether Robins had led Vivian to have this expectation. In any event, this difference of view is not material for present purposes.

*Katz And Robins Create "Independent Feasibility Studies" That They Attribute To JRV's Authorship*

More important is that during this period, Katz did agree to do certain work with Vivian. In particular, Katz wanted Vivi-

an—a reputable name in the ice rink industry—to conduct feasibility studies for some of the rinks that Katz was promoting. Vivian's company, JRV Management, was supposed to do the studies.

The problem was that JRV did not have the time or desire to undertake such work. In connection with a proposed ice rink in Mt. Laurel, New Jersey, Katz and Robins decided they could solve this problem by entering into an agreement whereby EnterSport—i.e., Katz and Robins—would be a subcontractor for JRV in the preparation of an "independent feasibility study" of the viability of a rink in that community. The integrity of such a study was important to Katz's business plans, as the study would be given to municipal authorities and possible bond financiers.

Rather than have JRV actually prepare the "Mt. Laurel Study," however, in fact, Katz's own staff—principally Robins and himself—actually did all the original work. Although they did receive some templates and other information from Vivian, the reality is that the study was drafted almost entirely by Robins, Katz, or persons working with them. Vivian did review the eventual first iteration of the Mt. Laurel Study and provided comments, but he neither wrote it nor verified the information contained in it.

The Mt. Laurel Study is replete with sections based on research supposedly done by JRV. In reality, that research was undertaken by Robins. Making the Study even more misleading is the fact that there are parts of the Study attributed to Katz's entity. Those parts were in fact created by Katz's entity but so were all the other parts attributed to JRV. For its "work," JRV was to get $20,000, of which $10,000 was to go back to EnterSport. Eventually, JRV was paid only $15,000 but it lived up to its agreement to pay EnterSport $10,000. Katz and Robins then received

$5,000 bonuses from EnterSport for their work on the Mt. Laurel Study. These fee arrangements and EnterSport's work on the Mt. Laurel Study were not disclosed in the Study itself or in any other manner to any of the Study's users or recipients.

The Mt. Laurel Study went through at least two iterations, with an April 1999 version and a later April 2000 version. There were changes to the Study in the April 2000 version, all of which were made by Robins, Katz or their EnterSport colleagues. The record fails to reveal any meaningful involvement by Vivian in these changes or any analysis by him of their soundness. Indeed, it is uncertain that Vivian even read the actual final version of the Mt. Laurel Study, as he had no memory of having seen it in his deposition. What is certain is that there is no document from EnterSport highlighting the numerous material changes in the Mt. Laurel Study, explaining them, and asking Vivian to affirm that they were reasonable.

Even more troubling, in November 1999, Katz and Robins prepared a feasibility study for a proposed ice rink in Northeast Philadelphia. The "Northeast Study" was drafted as if it was written by JRV Management. A cover letter with Vivian's signature was annexed to the Study.

The problem with this is that there is NO RECORD EVIDENCE that JRV Management was involved with the Northeast Study AT ALL. That is, even though the Mt. Laurel Study was not drafted by JRV Management, Vivian was at least aware of it and reviewed one early version. In the case of Northeast Philadelphia, neither Vivian nor anyone else at JRV Management had anything to do with the Study. Nonetheless, Katz presented this Study to the Commonwealth of Pennsylvania's Secretary of General Services in an attempt to get the Commonwealth to lease the site for the proposed rink to EnterS-

port for $1.00 per year.[3] As with the Mt. Laurel Study, there is no evidence that EnterSport's status as the real author of the Northeast Study and JRV's lack of any involvement was ever disclosed to any recipient of the Study.

*Katz Solicits The Plaintiffs To Invest With Him And Stresses The Importance Of The "Independent Feasibility Studies" And The Quality of Robins*

In November 1999, Katz lost a very close race for Mayor of Philadelphia. The next month he sought to interest plaintiff William Kronenberg in investing in an entity—a successor to American Skating—that would pursue Katz's vision for a business focused on community skating rinks. Katz had gotten to know Kronenberg in the previous year and Kronenberg had supported Katz's run for office through large contributions.

In initial meetings, Katz went over his vision with Kronenberg. He also told Kronenberg about Robins, and indicated that Robins was a professional with relevant experience who had worked for Katz for several years. Likewise, Katz touted that the projects he was proposing would be supported by independent feasibility studies done by JRV, which was knowledgeable in the industry, and that there would be a study to support each project and its related bond offering.

In January 2000, Katz followed up on these initial discussions by providing Kronenberg, as well as plaintiffs Piliero and Rosenberg, with a document called the "Community Sports Partners Investment Proposal."[4] In this document, Katz outlined the concept that would underlie the formation of a limited liability company—Community Sports Partners, LLC. This concept is now familiar to the reader, involving as it did the stimulation of the construction of skating rinks and other sports facilities by nonprofit corporations in various communities. "CSP" would not own the facilities but make money as the developer and manager of them.

Katz sought $11.5 million in equity financing for CSP. The specific projects were to be financed by loans from CSP enabling the establishment of nonprofit corporations (under § 501(c)(3) of the Internal Revenue Code[5]) and the payment of initial development costs. The major portion of the construction costs (85–90%) was to come from the issuance of tax-exempt bonds by the nonprofit corporations. This bond financing was therefore critical because each project was "to be separately financed through one or more series of bonds. The bond issues [were to] be secured by and payable from net revenues of the project."[6]

As a result, it was important for CSP to be able to demonstrate that the facilities to

---

**3.** *See* Katz Dep. at 373–76; Katz Dep. Ex. 25 & 26. In a letter dated December 27, 1999 to Secretary Gary Crowell, Katz said:

> We have engaged the firm of JRV Associates of Ann Arbor, Michigan to conduct an independent feasibility study. JRV is a well-known and nationally recognized consultant to the ice rink industry and has done prior work for American Skating. Their report, a copy of which i[s] attached and should be treated as confidential, clearly supports our belief that a twin rink/single multi-purpose surface community recre-

ation facility on this site in Northeast Philadelphia should be financially feasible.
Katz Dep. Ex. 25. There is no evidence that suggests that JRV was even aware of the Northeast Study, much less that it performed and wrote that Study.

**4.** Katz Dep. Ex. 28.

**5.** Internal Revenue Code of 1954 § 501(c)(3), 26 U.S.C. § 501(c)(3).

**6.** Katz Dep. Ex. 28 at 2.

be constructed could, if responsibly managed under normal market conditions, generate returns sufficient to pay off the bonds. To establish this credibility, Katz indicated in the Investment Proposal that:

> The sale of the bonds will be done through either a public offering or private placement. A key factor in each offering will be the persuasiveness of an independent market and financial feasibility study. The Company has engaged JRV Associates of Ann Arbor, Michigan, a leading consultant on ice skating rink development and management to prepare[] studies for two projects. These studies support the market demand and financial feasibility of the projects for which they were commissioned.[7]

The Investment Proposal went on to list six specific projects that were being pursued, including Mt. Laurel, Northeast Philadelphia, and projects in other mid-Atlantic communities including Brick Township, New Jersey and Lower Providence, Pennsylvania. The Proposal also discussed two members of CSP's management team as being "principals" of the company. They were Katz and Robins. As to Robins, the Proposal said:

> *Mark Robbins* [sic], is one of the nation's leading experts in the planning, development, construction, management and marketing of recreational facilities. Mr. Robins supervises CSP's recreational management efforts with an emphasis on facility location, market analysis and development. Mr. Robins has ... real estate development experience in projects ranging from single stand-alone

skating facilities to master planning for complex, mixed-use recreational development.[8]

As indicated previously, the statements in the Proposal regarding JRV can only be regarded as false and misleading. There is no evidence that JRV did any work on the Northeast Study and it appears that Robins affixed copies of Vivian's signature to the document.[9] As to Mt. Laurel, JRV would have been convicted of plagiarism by any university committee if it claimed to have authored the Mt. Laurel Study. That Study's real authors were Robins and Katz, and the Study was even more misleading because it did attribute certain aspects of the report to CSP, while asserting that JRV did the rest. That was untrue. And, as important, as to both Studies, it is clear that JRV was not "independent" in the sense communicated, as Vivian believed himself to be a prospective co-venturer and because (in the case of Mt. Laurel) JRV secretly (in the sense of doing so without disclosure to readers of the report) subcontracted with EnterSport (i.e., a future member of CSP) to do the work. That is, the very interests from which JRV was supposed to independent—Katz's entities who were promoting themselves as the developers—actually wrote both reports.

■■■■■ Of course, the disclosure about Robins is also grossly misleading. Putting aside the puffery about his expertise, the failure to disclose his storied criminal and bankruptcy experience makes what was disclosed materially misleading.[10] This is

---

7. *Id.*

8. *Id.* at 5.

9. Robins Dep. at 24. Robins claimed that Katz knew this was the case. I need not and do not make any finding to that effect.

10. The defendants suggest that none of the affirmative representations regarding Robins's background were actually false. This may or may not be true—the defendants have done nothing to show that Robins was actually a national leader in the relevant area. What is important, though, is that "[a]ccurate but incomplete assertions may be fraudulent in

especially so when the business concept required CSP to establish and maintain credibility with governmental organizations who would have to put their bonding authority (and ratings) on the line for these projects.

### Katz Gives The Plaintiffs An Updated Mt. Laurel Study That He Falsely Claimed That JRV Had Revised

A month later, Katz told plaintiff Kronenberg that JRV was "updating the numbers for Mt. Laurel and we should have a final draft report in time for our meeting on February 23rd, [2000]."[11] This statement was not true, as JRV was not updating the Mt. Laurel Study; Robins and Katz were. In his letter, Katz also acknowledged that Kronenberg was the point person for plaintiffs Piliero and Rosenberg, and noted that he was "very pleased to hear that you and *your partners* are interested in considering our proposal more seriously."[12] At the February 23, 2000 meeting, Katz went over the Mt. Laurel Study with Kronenberg and Piliero, discussed the importance of the independent feasibility studies, and the credentials of his management team.[13]

In April 2000, Katz sent an updated Mt. Laurel Study to Kronenberg, and urged him to share it with Piliero and Rosenberg, which Kronenberg did.[14] As the plaintiffs point out in a detailed exhibit they compiled,[15] the April 2000 Mt. Laurel Study contained numerous material changes from the 1999 version, including enhancements to the expected operating revenues for the facility. These changes appear to have all been made by Robins and Katz. JRV did not make them, and it is doubtful that JRV even gave them more than a cursory glance, if it even did that.[16] Indeed, there is no evidence that Vivian actually signed the April 2000 Mt. Laurel Study. Rather, the only record evidence on the point suggests that someone at EnterSport cut and pasted Vivian's signature and JRV's company logo onto the document.[17]

### Katz Gives The Mt. Laurel Study And Erroneous Information About Robins To Mercer County Officials

The 2000 Mt. Laurel Study was also given to the authorities in Mercer County, New Jersey, which was to issue the bonds for the facility. That Study was highlighted in the preliminary offering prospectus the Mercer County Improvement Authority's underwriters used to try to sell bonds for the project. Katz also gave the plaintiffs the preliminary prospectus before they made their investment. That preliminary offering prospectus stressed that the Mt. Laurel Study had been performed by

---

the absence of qualifying material." *DRR, L.L.C. v. Sears, Roebuck & Co.,* 949 F.Supp. 1132, 1141 (D.Del.1996).

11. Katz Dep. Ex. 29 at 2.

12. *Id.* at 1.

13. Kronenberg Dep. at 153–56; Piliero Dep. at 257–60.

14. *See* Katz Dep. Ex. 36.

15. *See* Plaintiffs' Post–Argument App. Ex. I at 7 (summarizing changes between April 1999 and April 2000 versions of Mt. Laurel Study); *see also* Katz Dep. Ex. 35 at App. C (April 5, 2000 Market Demand and Financial Feasibility Analysis for Mt. Laurel attached to Preliminary Official Statement for Mercer County bond issuance).

16. There is no evidence of any serious consideration of the changes by JRV in the record. At best, there is some evidence that the new drafts were sent to JRV but no evidence that the material changes were discussed, highlighted, or explained.

17. Robins Dep. at 56–57.

JRV.[18] The same document also gave a brief "resume" of both Katz and Robins. Robins was described as a highly experienced professional who was a "twenty-year veteran of new business initiation start-up and management" and who had "been a guest lecturer at Wharton, Drexel, [and] Temple." [19] Absent from Robins's "resume" were his felony convictions and bankruptcies, including those which occurred during the preceding twenty years. For obvious reasons, the dissemination of this materially misleading information to a government entity, which then unwittingly communicated it to prospective investors, is troubling and put CSP in a compromised position from the get-go.

### The Plaintiffs Rely On Katz's Misstatements In Agreeing To Invest In And Sign The CSP LLC Agreement

In April 2000, plaintiffs Kronenberg, Piliero, and Rosenberg agreed to invest in the CSP concept by entering into an LLC Agreement on April 28, 2002. In that Agreement, they became members of the LLC, as did Katz's controlled entity, EnterSport. Katz himself did not become a member. The plaintiffs invested a total of $2.1 million. The LLC Agreement had minimal representations and warranties, and included a fairly standard integration clause. In entering the LLC Agreement, plaintiff Kronenberg claims to have relied upon the bona fides of the Mt. Laurel and Northeast Studies, in the sense that he believed that these Studies were in fact independent feasibility studies prepared in good faith by a reputable industry expert. He also says he relied on Katz's statements regarding the CSP management team, including Robins. Kronenberg's claims of reliance in fact are essentially unrebutted in the record, given that he was in frequent contact with Katz and was the key man for the plaintiffs in determining whether to invest.

As for plaintiffs Piliero and Rosenberg, the record is a bit muddier in this respect, but still ultimately reveals no material issue of fact as to their claims of reliance. Each of them received the feasibility studies and were led to believe they had been prepared by JRV, and that JRV was independent from Katz and his entities. Each was also told that Robins was a respected, experienced executive and received no disclosure of Robins's criminal record and personal bankruptcies. The defendants argue that Piliero and Rosenberg did not actually rely on the Mt. Laurel and Northeast Studies because they really relied on Kronenberg's judgment, rather than doing any independent review of the Studies or placing any confidence in Robins. This is not a rational inference to draw from the evidentiary record, however.

Rather, it is perfectly sensible for business associates to entrust one of their number with lead responsibilities for a project and to cue off of him. That was what was done here. To the extent that Kronenberg reasonably relied, so did his colleagues, in the sense that they were relying on Kronenberg to screen these issues. Also, the record reveals that Piliero and Rosenberg reviewed the two Studies and had been told by Katz about how impressive Robins's skills and experience were. There is no rational basis to conclude that they did not rely upon Katz in the sense of trusting that the Studies were what he purported them to be—independent studies prepared by JRV—and that Robins was what Katz led them to believe—an experienced executive with a track record of success. Finally, there is no doubt that Katz expected that all of his

---

**18.** Katz Dep. Ex. 35 at 2.

**19.** *Id.* at 9.

statements to Kronenberg to influence an investment by Kronenberg would also contribute to Kronenberg's ability to get his associates Piliero and Rosenberg to invest as well. In fact, Katz communicated with Piliero and Rosenberg directly on certain occasions and on other occasions encouraged Kronenberg to pass on information to them. Katz knew that Piliero and Rosenberg were relying on Kronenberg as their point man, and there is no rational basis to permit a defendant to avoid liability for misrepresentations made during negotiations leading to execution of a contract merely by claiming that certain of his contracting partners chose to designate a point person in those negotiations.

### CSP Does Not Thrive, Robins Embezzles Funds, And This Lawsuit Ensues

The record gets extremely diffuse regarding the precise chain of events that occurred after the plaintiffs invested in CSP and the LLC Agreement was executed. Eventually, it became clear that CSP could not obtain bond financing for the Mt. Laurel project. In order to salvage something from that project, a new LLC, CSPII, was formed on March 30, 2001 to provide funding for the construction of the Mt. Laurel facility. CSP's ownership interest in that facility—the land—was transferred to CSPII in exchange for a sum of money that the parties dispute. What is not disputed is that CSPII owes CSP money for the transfer. On the books of CSPII, CSPII carried its obligation to CSP at a total of $957,157, and for a period of time made certain payments towards paying off that sum.

Over 90% of CSPII's equity is owned by the plaintiffs. Katz's entity EnterSport owned a 5.1% interest and Robins owned 1.4% of CSPII. The idea was that CSPII would own the facility and that CSP would be paid to develop and manage it.

During this period, CSP tried to develop other projects. Regrettably, the record reveals that the same pattern of conduct that characterized the earlier feasibility studies was continued. CSP's own staff (Robins and Katz) prepared feasibility studies and represented them as having been conducted and written by JRV. Although there is some mud in the water on this point, the record is indisputably clear that these studies were not in fact independent studies created by JRV.[20] Instead, they were CSP's own handiwork and any dissemination of them in the form they were written was inherently misleading.[21]

By the late summer of 2001, CSP had burned through the $2.1 million the plaintiffs had invested. By this time, the plaintiffs were quite dubious about the prospects for CSP and relations between themselves, and Katz and Robins were beginning to show strain. As discussed, by this time, the Mt. Laurel project had been transferred to CSPII in exchange for certain consideration that remains in dispute.

More certain is that by the autumn, plaintiff Piliero began to become more actively involved in the management of CSP. He did so by refusing to send monies from CSPII to CSP except for activities he (acting for himself, Kronenberg, and Rosen-

---

20. This is the only fair reading of Vivian's, Katz's, and Robins's deposition testimony, when taken together.

21. Because it is not necessary to make a ruling on the plaintiffs' motion, I resist their invitation for me to conclude that these documents involve forgery. For present purposes,

it suffices to indicate that the record compels the conclusion that these studies would not satisfy any definition of independent feasibility studies actually prepared and written by JRV. There simply is no countervailing evidence that would rationally support a contrary inference.

berg) thought might pay off. By this stage, the plaintiffs as a group feared that they had made a bad investment and did not want to keep digging the hole. Because CSP was cash-strapped and because neither Katz nor Robins were prepared to invest any cash themselves, CSP's ability to go forward with projects was minimal and the refusal of CSPII to forward funds could not have helped matters. On the other hand, the record is devoid of any evidence that CSP really was viable by this point, having burned through a large amount of cash, having failed to be able to push forward with Mt. Laurel itself as planned, and lacking any firm contracts for other projects. Put bluntly, CSP was lingering on life support, or so the record suggests.

The final blow came early in 2002. In February 2002, it became apparent that Robins was embezzling monies from CSP and CSPII in a scheme in which he made it appear that certain payments were going to contractors but were in fact going into his own pocket. Robins pled for mercy but Katz had nothing of it. Robins then went to the plaintiffs and spilled his guts about all sorts of things, including the feasibility studies. At this point, Robins was desperate to save himself and made many accusations regarding Katz, in an apparent effort to lead the plaintiffs to take pity on him and distribute their ire more evenly between Robins and Katz.

A period of discussions between all concerned followed. Katz was unable to work out a resolution with the plaintiffs and this lawsuit was filed. Robins was eventually prosecuted and pled guilty to embezzle-

ment. He is now serving a prison sentence.

In the wake of these events, CSP has ceased all active operations and exists only as a vehicle so that it can recoup funds to pay its creditors. CSPII is operating the Mt. Laurel facility.

## B. The Procedural Framework For Analyzing The Plaintiffs' Rescission Claims

The parties have filed motions for summary judgment. I apply the familiar standard that governs such motions. That standard requires that all rational inferences from the factual record be drawn in favor of the nonmoving party. If, after reading the record in this manner, the court is convinced that there is no genuine issue of material fact that precludes the entry of judgment for the moving party, the motion will ordinarily be granted.[22] When cross-motions for summary judgment are filed, the same standard must be applied to each of the parties' motions and the mere existence of cross-motions does not necessarily indicate that summary judgment is appropriate for one of the parties.[23]

I now apply these principles to the parties' motions, beginning with the plaintiffs' claims that assert that they are entitled to rescission of their investment in CSP because: i) they were fraudulently induced to make their investment; and ii) Katz violated the Pennsylvania Securities Act by making materially misleading statements

**22.** *See, e.g., Goodwin v. Live Entm't, Inc.,* 1999 WL 64265, at *5 (Del.Ch. Jan.25, 1999), *aff'd,* 741 A.2d 16 (Del.1999).

**23.** *See State of Wisconsin Inv. Bd. v. Peerless Sys. Corp.,* 2000 WL 1805376, at *6 (Del.Ch. Dec.4, 2000) ("The fact that the parties have filed cross motions does not alter the applicable [summary judgment] standard. The Court retains the discretion to deny both motions if it decides that the record requires a more thorough development to clarify the law or its application to the case." (footnote omitted)).

in connection with the sale of securities, to wit, membership interests in CSP.[24]

### C. *The Plaintiffs' Fraud In The Inducement Claims*

■ The plaintiffs contend that there is undisputed evidence that Katz made materials misstatements or omissions of fact that fraudulently induced their investment in CSP. When one puts aside the integration clause of the LLC Agreement for a moment, that contention—which must be proved to support a fraud claim under Delaware or Pennsylvania law—is obvious-ly correct. Moreover, both Delaware and Pennsylvania law provide that a defendant can be liable for a misrepresentation even if he did not know of the falsity of his statements.[25]

■ Although the defendants make arguments regarding why the misleading statements regarding the Mt. Laurel and Northeast Studies and Robins's credentials were not material, those arguments lack any logical force. It is absolutely clear that reasonable investors would have considered it material to know that the inde-

---

**24.** Under the Pennsylvania Securities Act, the definition of "security" includes a "membership interest in a limited liability company of any class or series, including any fractional or other interest in such interest, unless excluded by clause (v)," Pa. Stat. Ann. tit. 70, § 1–102(t), an exclusion that the defendants do not contend is applicable here.

**25.** Vice Chancellor Lamb recently summarized the elements of common law and equitable fraud as follows:

> Common law fraud in Delaware requires: 1) the existence of a false representation, usually one of fact, made by the defendant; 2) the defendant had knowledge or belief that the representation was false, or made the representation with requisite indifference to the truth; 3) the defendant had the intent to induce the plaintiff to act or refrain from acting; 4) the plaintiff acted or did not act in justifiable reliance on the representation; and 5) the plaintiff suffered damages as a result of such reliance. In addition to overt representations, fraud may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak. To state a claim for equitable fraud under Delaware law, a plaintiff must satisfy all the elements of common-law fraud with the exception that plaintiff need not demonstrate that the misstatement or omission was made knowingly or recklessly.

*H–M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 144–45 (Del.Ch.2003) (footnotes and quotations omitted). In Pennsylvania, the core requirements are similar. The Pennsylvania Supreme Court has described the elements of causes of action for intentional and negligent misrepresentation, respectively, as follows:

> [I]ntentional misrepresentation or fraud ... contains the following elements: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.
>
> . . . .
>
> The elements [of a negligent misrepresentation claim] are: (1) a misrepresentation of a material fact; (2) the representor must either know of the misrepresentation, must make the misrepresentation without knowledge as to its truth or falsity or must make the representation under circumstances in which he ought to have known of its falsity; (3) the representor must intend the representation to induce another to act on it; and (4) injury must result to the party acting in justifiable reliance on the misrepresentation. Thus, negligent misrepresentation differs from intentional misrepresentation in that to commit the former, the speaker need not know his or her words are untrue, but must have failed to make reasonable investigation of the truth of those words.

*Gibbs v. Ernst*, 538 Pa. 193, 647 A.2d 882, 889–90 (1994) (citations omitted). Pennsylvania also appears to recognize an equitable cause of action for innocent misrepresentation in certain circumstances. *See Bortz v. Noon*, 556 Pa. 489, 729 A.2d 555, 563–65 (1999).

pendent feasibility studies that were so important to the effective implementation of the business plan for CSP were in fact not independent at all and had not in fact been prepared by their stated author. In fact, as to one study, the Mt. Laurel Study, Katz and Robins personally received undisclosed bonuses to compensate them for their role as the real authors of that Study. As to the other Northeast Study, JRV had no involvement at all. If these facts had been revealed, no reasonable investor would have proceeded to deal further with Katz and Robins. Katz admitted as much in his deposition.

This reality is made all the more apparent given the intended recipients of the independent feasibility studies. It is a criminal offense in Pennsylvania and New Jersey to intentionally make a false statement to a government official.[26] Moreover, both federal[27] and Pennsylvania[28] law prohibit the making of false statements in connection with a sale of securities, such as tax-exempt bonds. The argument that reasonable investors would have put money in CSP if they knew that CSP intended to present government agencies

and underwriters with independent feasibility studies that were not what they purported to be does not pass the straight-face test.

Likewise, no reasonable investor would have proceeded to invest in CSP if she knew that one of the key fiduciaries would be Robins. Given that CSP was going to be dealing with government agencies that were putting their bonding capacities and ratings at risk, to the taxpayers' possible detriment, it is inconceivable that reasonable investors would have proceeded to invest, knowing that Katz intended for Robins to be the Chief Operating Officer of the company and to have control over corporate funds. In so concluding, I do not mean to imply that persons with criminal records cannot be rehabilitated, only that persons with records like Robins would only be permitted to play carefully constrained and supervised roles, and that if they were put in a fiduciary role, it would only be after full and open disclosure. Defendant Katz acknowledged that this is so. He testified that he could never have proceeded with CSP had he known of Robins's real past.[29] As a result, Katz's

---

**26.** Under Pennsylvania law,

A person commits a misdemeanor of the second degree if, with intent to mislead a public servant in performing his official function, he:

(1) makes any written false statement which he does not believe to be true;

(2) submits or invites reliance on any writing which he knows to be forged, altered or otherwise lacking in authenticity; or

(3) submits or invites reliance on any sample, specimen, map, boundary mark, or other object which he knows to be false.

18 PA. CONS.STAT. ANN. § 4904(a).

*Under New Jersey law,*

A person commits a disorderly persons offense if, with purpose to mislead a public servant in performing his function, he:

(1) Makes any written false statement which he does not believe to be true;

(2) Purposely creates a false impression in a written application for any pecuniary or

other benefit, by omitting information necessary to prevent statements therein from being misleading;

(3) Submits or invites reliance on any writing which he knows to be forged, altered or otherwise lacking in authenticity; or

(4) Submits or invites reliance on any sample, specimen, map, boundary-mark, or other object which he knows to be false.

N.J. STAT. ANN. § 2C:28–3(b).

**27.** *See* Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5.

**28.** *See* PA. STAT. ANN. tit. 70, § 1–401.

**29.** That is the sum and substance of Katz's testimony. Katz was clear that he would never have hired Robins if he knew about his past, much less sought others to invest money in an enterprise in which Robins would be a key executive and fiduciary.

argument that the plaintiffs did not rely on his incomplete statements regarding Robins has no force, as a matter of common sense. Although it might be true that the plaintiffs were not premising their investment decision on the question of whether Robins was truly a nationally recognized industry leader or simply a competent executive, it is incredible for Katz to argue that the plaintiffs were not relying on Robins's basic honesty, a reliance that was fostered by the statements Katz made and by Katz's failure to disclose a large number of facts that cut against that premise. If Katz had said, "oh, by the way, my right-hand man not only has industry experience, he has a lengthy criminal and bankruptcy-court record," there is no rational doubt that the plaintiffs would not have invested.

To this point, the nature of CSP's business plans only heightens the materiality of Robins's past. In every business enterprise of any complexity, there are risks. To go forward with a business dependent on use of governmental bonding authority with a COO with a criminal record like Robins's would have been obviously foolish—this is especially so when the predecessors to the business (i.e., EnterSport and American Skating) had already used Robins to interact with government officials and had failed to make full and complete disclosure of his background and had led those officials to believe Robins was a proven performer with a lengthy record of success. Whenever Robins's true past came to surface, Katz risked losing all credibility with the very public officials and underwriters whose trust and confidence was critical to the business concept that CSP was supposed to implement.

In sum, it is clear that Katz made material misrepresentations of facts that would have been important to a reasonable inves-

tor considering committing funds to CSP and becoming a member of that LLC and made those representations with the intent to induce the investors to participate. Whether or not Katz knew the true state of affairs regarding certain of these matters, it is clear that reasonable investors—including the plaintiffs—would not have invested in CSP had they known the truth. That is the only rational conclusion one can draw from the record.

Of course, this case cannot be that easy, and there is a wrinkle. I turn to that wrinkle now.

*Does The Integration Clause In The LCC Agreement Prevent The Plaintiffs From Reasonably Relying On Katz's Statements Of Fact?*

■ The defendants' major defense rests on the integration provision in the LLC Agreement, which reads as follows:

> GP 18.1 *Entire Agreement.* This Agreement, which includes the Exhibits and shall include any Joinders upon execution thereof, constitutes the entire agreement and understanding of the parties hereto with respect to the subject matter hereof and supersedes all prior or contemporaneous agreements, understandings, inducements, or conditions, oral or written, express or implied.[30]

According to the defendants, this provision precludes the plaintiffs from reasonably relying upon any statement of fact made by Katz that was not contained within the four corners of the LLC Agreement. Because the LLC Agreement does not contain any representations regarding the Mt. Laurel and Northeast Studies or Robins's background, the defendants say that the integration clause makes reliance upon

---

30. Agreement Ex. C § 18.1.

statements regarding those issues conclusively unreasonable. More specifically, they say that the integration clause is a contractually binding promise by the plaintiffs that they had no "understandings" with anyone that were not set forth in the LLC Agreement and that they had received no "inducements" not contained in the Agreement. Under either of the possible governing laws, those of Delaware or Pennsylvania, the defendants argue that the integration clause bars a fraud claim because that clause is supposedly a dispositive statement by the plaintiffs that they would not and could not rely on statements of fact unless those statements were incorporated into the text of the LLC Agreement.

For their part, the plaintiffs argue that the integration clause in the LLC Agreement is not an express "anti-reliance" clause and therefore cannot be read as one. Even more aggressively, the plaintiffs contend that neither Pennsylvania nor Delaware law permit contractual integration and/or anti-reliance clauses to bar fraud in the inducement claims, given the important public policy interest in deterring fraudulent behavior.

I confront these competing arguments now, after briefly noting the choice of law question. According to the plaintiffs, Pennsylvania and not Delaware law applies to their fraud claim. Although the LLC Agreement itself applies the law of Delaware to its contractual terms, regardless of principles of choice of law, the plaintiffs observe that the choice of law provision in the LLC Agreement is constrained and does not purport to extend Delaware law to all claims that are in any way related to the LLC Agreement.[31] Furthermore, a recent decision of this court—*Gloucester Holding Corp. v. U.S. Tape & Sticky Products, LLC*—held that the mere presence of a choice of law provision in a contract selecting Delaware law did not have the effect of making Delaware law the appropriate law to govern a fraudulent inducement claim.[32] Rather, the court held that it must apply the law of the state with the "most significant relationship to the occurrence and the parties,"[33] which in that case the parties agreed was Massachusetts.[34] By parity of reasoning, the plaintiffs contend, I must apply Pennsylvania law to their fraud claims because the choice of law provision in the LLC Agreement is not broad enough to sweep in fraudulent inducement claims and because the parties reside in and conducted their negotiations in Pennsylvania. In any event, the plaintiffs say, the choice of law does not matter because Delaware and Pennsylvania law do not differ on the pertinent issues.

For their part, the defendants do not care which state's law is applied, because all parties agree that both states' law are identical in the aspects of fraud law relevant to this case (although they disagree

**31.** The Agreement provides that the "Company is established pursuant to, and its operations shall be governed by" the Delaware Limited Liability Company Act, and that with regard to all matters other than matters of federal taxation, "this Agreement, its interpretation, performance and enforcement, and the rights and remedies of the parties hereto, shall be governed and construed by and in accordance with the laws of the State of Delaware, without regard to principles of conflict of laws." Agreement Ex. C § 18.5.

**32.** 832 A.2d 116, 123–25 (Del.Ch.2003).

**33.** *Id.* at 124 (citing Restatement (Second) of Conflict of Laws § 145(1) (1971)).

**34.** *Id.* at 124 n. 17. The court also noted that the alleged misrepresentations and omissions occurred in connection with the lease of real property and sale of assets located in Massachusetts. *Id.*

as to what that identity consists of). As a result, I have no adversarial briefing on this subtle issue. I say "subtle issue" because I am not sure that the reasoning of *Gloucester Holding Corp.*—a case involving an asset sale—precludes the selection of Delaware law in this case. Here, the nature of the contract was importantly different. The plaintiffs here were entering into a relationship-based contract in which Katz and Robins would become their fiduciaries. Arguably, Delaware has the most significant relationship to a fraud in the inducement—or tort—claim involving the formation of a Delaware entity through which parties intend to pursue a business relationship. Because those parties clearly expected that, assuming the validity of their contract, Delaware law would govern their relations with each other (i.e., the internal affairs of the organization they created, the fiduciary duties owed to the members, and the contractual rights of the parties to the LLC Agreement), it seems sensible to think that the parties realized that Delaware might have the strongest interest in applying its law to any fraud claims addressed to the execution of the LLC Agreement itself. This is not to say that Delaware would have a strong connection to *any* equity investment in *any* Delaware entity. But, in a case involving the initial formation of a Delaware LLC and the question of whether the largest cash investors can rescind their assent to the LLC Agreement, Delaware has a strong and legitimate interest in applying its fraud law to claims that, by their very nature, can practically result in the termination of a Delaware business entity. Furthermore, when parties of whatever geographic residence direct their commercial affairs so clearly in the direction of

Delaware and intend to conduct a business in several states—both factors that apply here—the contracting parties' own conduct also supports Delaware's connection to the fraud claims. If forced to choose in the absence of adversarial briefing, I would therefore incline towards the application of Delaware fraud law to this particular case given the specific facts present here.

Rather than decide that issue, however, I sidestep it. Where the choice of law would not influence the outcome, the court may avoid making a choice.[35] Lacking adversarial briefing on this question, I therefore accept the parties' view that Delaware and Pennsylvania law are the same for all relevant purposes—a view that is supported by a review of the relevant authorities—and proceed without deciding which state's fraud law ultimately governs.

Although the parties agree that Delaware and Pennsylvania's common law of fraud are identical, they reach divergent conclusions about what that identity consists of. For the reader's sake, I will devote most of my attention to Delaware jurisprudence, and simply note later why I believe that the Pennsylvania courts would likely reach the same result as the one required by Delaware law.

As mentioned, the plaintiffs argue that even an explicit anti-reliance clause does not bar fraud claims. By contrast, the defendants argue that even a standard integration clause without explicit anti-reliance language precludes reasonable reliance on factual statements not contained within the contract.

On balance, the plaintiffs have the better of the argument. Although the Delaware Court of Chancery has interpreted certain

---

**35.** *ABB Flakt, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, P.A.,* 1998 WL 437137, at *5 (Del.Super. June 10, 1998) ("When a choice of law analysis does not impact the outcome of the courts decision, no choice of law analysis need be made."), *aff'd,* 731 A.2d 811 (Del. 1999).

contractual provisions as barring a plaintiff's reasonable reliance on factual statements not included within a contract, those holdings are, as the plaintiffs note, in some tension with the prior authority of the Delaware Supreme Court in *Norton v. Poplos*.[36] In that case, the Delaware Supreme Court reversed this court's judgment denying rescission of a contract containing a provision in which the plaintiffs had specifically "acknowledge[d] that they d[id] not rely on any written or oral representations not expressly written in [the] contract."[37] The Supreme Court held that this explicit anti-reliance language did not bar a fraud in the inducement claim—even one based on an innocent misrepresentation—concluding that "even if a sales contract contains a merger clause, a buyer may rescind the contract if it resulted from an innocent but material misrepresentation by the seller."[38]

In some significant recent decisions of this court, *Norton v. Poplos* has been read as having turned importantly on the relatively unsophisticated nature of the parties involved in the case, the fact that they were entering a simple real estate contract and did not bargain over the specific disclaimer language, and therefore as not preventing this court from giving effect to an anti-reliance clause in cases involving experienced businesspersons or entities negotiating complex commercial agreements.[39] This court's recent decisions have been characterized by Vice Chancellor Lamb in *H–M Wexford LLC v. Encorp, Inc.* as "consistently [holding] that sophisticated parties to negotiated commercial contracts may not reasonably rely on information that they contractually agreed did not form a part of the basis for their decision to contract."[40] The policy basis for this reasoning was addressed in another recent decision: *Progressive International Corp. v. E.I. DuPont de Nemours & Co.*[41]

In *Progressive*, the plaintiff sought to rescind a license agreement it entered with DuPont. In the agreement, DuPont had sought and obtained the inclusion of the following representation:

> *Integration.* This LICENSE and any attached schedules and exhibits, constitutes the entire agreement between the Parties pertaining to the subject matter contained herein and supercedes all prior and contemporaneous agreements, representations, and understandings of the Parties. Each of the Parties acknowledges that no other party, nor any agent or attorney of any other party, has made any promise, representation, or warranty whatsoever, express or implied, and not contained herein, concerning the subject matter hereof to induce the Party to execute or authorize the execution of this LICENSE, and acknowledges that the Party has not executed or authorized the execution of this instrument in reliance upon any such promise, representation, or warranty not contained herein . . . .[42]

Nonetheless, Progressive brought a fraud claim arguing that it had relied upon statements of fact by DuPont that were

---

**36.** 443 A.2d 1 (Del.1982).

**37.** *Id.* at 3.

**38.** *Id.* at 6.

**39.** *E.g., Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 2001 WL 765187; at *10 (Del.Ch. June 29, 2001).

**40.** 832 A.2d 129, 142 n. 18 (Del.Ch.2003).

**41.** 2002 WL 1558382 (Del.Ch. July 9, 2002).

**42.** *Id.* at *5.

not within the four corners of the license agreement. This court dismissed that claim, noting that permitting Progressive to proceed seemed to create imprudent incentives for contracting parties:

> When it signed the Agreement, Progressive averred that it had read all its terms and agreed to all its provisions, including the provision stating it was not relying upon any representations outside the four corners of the contract. But Progressive now asserts that it was—contrary to its promise to DuPont—relying on cost-of-production representations outside the scope of that Agreement. In essence, Progressive is saying to the court, "Believe us now when we tell you we made a false promise to DuPont then."

> The law cannot sanction this type of argument. DuPont bargained for the promises made in the integration clause. Had Progressive insisted upon the elimination of that clause, DuPont might well have decided not to sign the License Agreement, precisely because it did not want to be subjected to after-the-fact rescission claims premised on oral discussions between the parties that were never formalized into contractual promises.

> If Progressive is allowed to proceed with its fraudulent inducement claims, it will be released from its own breach of the License Agreement, a result that is unreasonable and that creates a troubling precedent for commercial parties forging future contracts. By contrast, if Progressive is expected to live up to its own words, the reasonable expectations of the parties to the License Agreement are enforced and the importance of contractual text is reinforced—results in keeping with the public policy of this state.[43]

In this case, the plaintiffs argue that the reasoning of *Progressive* and other decisions like it cannot be reconciled with *Norton v. Poplos*. The defendants argue otherwise.

For present purposes, it is unnecessary to resolve that tension, however, because this decision can be premised on grounds that are consistent with both *Norton v. Poplos* and the recent Chancery line of cases exemplified by *H–M Wexford* and *Progressive*.

What is strikingly absent in this case is the presence of a clear and unambiguous contractual provision in which the plaintiffs forthrightly affirm that they are not relying upon any representation or statement of fact not contained within the LLC Agreement. At best, the LLC Agreement contains an integration clause that may, under one reading, be construed to be broad enough to plausibly state that the plaintiffs were not relying on extra-contractual statements because such reliance could be said to involve an "understanding[ ]" among the parties or an "inducement[ ]" from the defendants to the plaintiffs. Because the integration clause says that no "understandings" or "inducements" existed that were not set forth in the LLC Agreement, the plaintiffs arguably could not reasonably rely on such "understandings" or "inducements" in deciding to invest in CSP and become parties to the LLC Agreement.

Were the parties to the LLC Agreement writing on a blank slate not shaped by decades of American common law, this linguistic argument would have more force. But against the actual legal context in which the parties were contracting, the defendants' interpretation of the integration clause is a strained one, which is at best one possible reading of that clause. A more traditional interpretation of lan-

43. *Id.* at *10.

guage of this kind is that it simply operates to police the variance of the agreement by parol evidence. As the plaintiffs have shown, the integration clause in the CSP LLC Agreement is a standard one and similar clauses have been incorporated into "model" agreements for limited liability companies and other entities. The commentary on these clauses does not suggest that they operate as a bar to fraud claims but rather simply to limit the scope of the parties' contractual obligations to those set forth in the written agreement.[44] Likewise, many learned authorities state that typical integration clauses do not operate to bar fraud claims based on factual statements not made in the written agreement.[45] Given this context, one has to read the integration clause in the CSP LLC Agreement very deeply to construe it as a true anti-reliance clause.

From the record, there is no evidence that any of the parties to the LLC Agree-

**44.** As the plaintiffs note, the integration clause in the CSP LLC Agreement bears the same section number, § 18.1, as that contained in many other LLC contracts because they are modeled on an agreement contained in the following treatise: JOHN M. CUNNINGHAM, DRAFTING LIMITED LIABILITY OPERATING AGREEMENTS (1999). In that treatise, the author comments on the integration clause without stating that it acts as a bar to fraud claims. *Id.* at C1–119. *See also* COMMITTEE ON NEGOTIATED ACQUISITIONS, AM. BAR ASS'N, MODEL ASSET PURCHASE AGREEMENT WITH COMMENTARY 262 (2001) (providing commentary on an integration clause similar to the one in the CSP LLC Agreement but not indicating that it bars fraud claims based on extra-contractual statements of fact); SUBCOMM. ON THE PROTOTYPE LTD. LIAB. P'SHIP AGREEMENT FORMED UNDER THE UNIF. P'SHIP ACT (1997), AM. BAR ASS'N, PROTOTYPE LIMITED LIABILITY PARTNERSHIP AGREEMENT 22, 107 (2003) (commentary never suggesting that the integration clause bars reliance on factual statements not contained in the agreement, and suggesting that the failure of the parties to include a specific provision governing information disclosure at formation would leave "pre-formation issues" to be addressed by "the law of fraud").

**45.** *See, e.g.,* 2 E. ALLEN FARNSWORTH, FARNSWORTH ON CONTRACTS § 7.4, at 247 (3d ed. 2003) ("To the extent that evidence of misrepresentation is admissible [under the parol evidence rule] even if the agreement is completely integrated, it is admissible in the face of the usual merger clause, though ... a few courts have countenanced clauses specifically reciting that there have been no misrepresentations." (footnotes omitted));

JOHN EDWARD MURRAY, JR., MURRAY ON CONTRACTS § 84(C)(2), at 440–41 (4th ed. 2001) ("There can be no question that evidence of fraud, mistake or other invalidating causes cannot be precluded by a merger clause."); RESTATEMENT (SECOND) OF CONTRACTS § 214 cmt. c (1981) ("What appears to be a complete and binding integrated agreement ... *may be voidable for fraud,* duress, mistake, or the like, or it may be illegal. Such invalidating causes need not and commonly do not appear on the face of the writing. *They are not affected even by a 'merger' clause.*" (emphasis added)); 11 RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS BY SAMUEL WILLISTON § 33:21, at 670–71 (4th ed. 1999) ("Just as is the case with the parol evidence rule itself, a merger or integration clause is ineffectual to exclude evidence of prior or contemporaneous extrinsic representations for the purpose of showing fraud or other invalidating cause by way of defense or in an action for rescission."); *Id.* at § 33:21, at 672–73 ("The better view is ... to ask whether a fraudulent misrepresentation (as opposed to, say, a warranty) has been made and whether the party asserting the fraud would have entered the agreement had he or she known the representation was false; if not, the contract should be voidable to the same extent as if there were no merger clause and, indeed, as if there were no writing, and the parol evidence rule should not be applied."); 2 RONALD A. ANDERSON, ANDERSON ON THE UNIFORM COMMERCIAL CODE § 2–202:54, at 286 (3d ed.1997 revision) ("An integration clause does not bar claims for negligent misrepresentation and fraudulent inducement. An integration or merger clause gives rise to a rebuttable presumption that the writing contains the total contract but this presumption can be overcome by a showing of fraud, bad faith, unconscionability, negligent omission or mistake in fact." (footnotes and citations omitted)).

ment viewed the integration clause as a bar to fraud claims. The provision was not heavily negotiated and Katz's attorney did not testify that he intended the clause to have that effect. Indeed, the possible effect of the integration clause as a bar to fraud claims was not even raised by the defendants' able counsel in its initial response to the plaintiffs' complaint.

This is understandable given that the integration clause does not speak in any direct way to the reliance by the plaintiffs on factual statements of Katz. Although it does say there were no "understandings" or "inducements" not set forth in the LLC Agreement, this can be read as simply indicating that there were no separate oral contracts and that there was no separate consideration (i.e., inducements) for entering the Agreement, other than as provided in the LLC Agreement.

■ What is clear is the lack of clarity. And this murkiness is fatal to the defendants' position. In all of the decisions in which this court has found that fraud claims were barred by contractual provisions, the court has concluded that the contract's terms, when read together, constituted a clear statement by the plaintiff that it was not relying on the very factual statements that the plaintiff was contending to be fraudulent. Because Delaware's public policy is intolerant of fraud, the intent to preclude reliance on extra-contractual statements must emerge clearly and unambiguously from the contract. By this approach, the public policy interests discussed in *Norton v. Poplos* are respected, while preserving the contractual freedom and efficiency concerns recognized by this court's recent decisions.

■ Stated summarily, for a contract to bar a fraud in the inducement claim, the contract must contain language that, when read together, can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract. The presence of a standard integration clause alone, which does not contain explicit anti-reliance representations and which is not accompanied by other contractual provisions demonstrating with clarity that the plaintiff had agreed that it was not relying on facts outside the contract, will not suffice to bar fraud claims. Rather, in that circumstance, the defendant will remain at risk if the plaintiff can meet the difficult burden of demonstrating fraud.

This approach balances fairness and efficiency in a sensible way. Parties who wish to protect themselves against fraud claims can seek explicit anti-reliance language that will have that effect. But if they fail to do so, they will not be able to escape responsibility in tort by latching on to a possible reading of an ambiguous integration clause, in an American legal environment that has tended, on balance, not to construe such provisions as barring fraud claims. Rather than dilate on the intricacies of Pennsylvania fraud law and further try the reader's patience, I simply note my conclusion that this balance is also the one that best reflects Pennsylvania law, given that the case law of that commonwealth has wrestled with the same policy concerns in a style similar to that used by the Delaware courts.[46]

**46.** As the defendants note, there are cases decided under Pennsylvania law that arguably construe standard integration clauses as anti-reliance provisions precluding claims of fraudulent inducement (as opposed to fraud in the execution). Most of those cases were decided by federal district courts. *See, e.g., Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc.,* 40 F.Supp.2d 644, 653–56 (W.D.Pa. 1999) (holding that integration clause barred

Applying that approach here, I conclude that the defendants cannot escape responsibility for the material misstatements of fact made to the plaintiffs in connection with the plaintiffs' decision to invest in CSP. The integration clause in the LLC Agreement is not an unambiguous acknowledgement by the plaintiffs that they were not relying on factual statements not contained within the LLC Agreement itself.

fraudulent inducement claims under Pennsylvania law). In *Sunquest,* the court admitted, however, that "Pennsylvania law on this point is not a model of clarity, having evolved in fits and starts over the last half century." *Id.* at 653; *see also 1726 Cherry St. P'ship v. Bell Atlantic Props., Inc.,* 439 Pa.Super. 141, 653 A.2d 663, 668 (1995) ("We, too, have attempted to find consistency in Pennsylvania parol evidence cases where fraud is alleged. Our examination of the pertinent cases has led us reluctantly to conclude that no intellectually sound analysis of the cases can yield a perfectly consistent set of principles."); *CoreStates Leasing Inc. v. Housewright,* 1998 WL 151028, at *5 (E.D.Pa. Mar.31, 1998) (noting that it is "difficult to reconcile" Pennsylvania Supreme Court cases on question of whether "fraud in the inducement makes any contract voidable, including one with an integration clause, or whether a contract, and especially one with an integration clause, precludes evidence of all prior negotiations, even fraudulent ones"). I agree with the defendants that a Pennsylvania court would give weight to an integration clause in evaluating a fraud claim by, for example, refusing to allow a plaintiff to rely on an extra-contractual factual statement that was inconsistent with or otherwise varied an explicit provision of the integrated contract. The cases that the defendants cite generally fall into this category. *See, e.g., HCB Contractors v. Liberty Place Hotel Assocs.,* 539 Pa. 395, 652 A.2d 1278 (1995) (holding that where plaintiff's claims "relate to subjects that were specifically addressed in the written contract" and contract contained integration clause, fraudulent inducement claims were barred by parol evidence rule); *1726 Cherry St. P'ship,* 653 A.2d at 663 (holding that "[t]he parol evidence rule precludes admission of evidence of allegedly fraudulent misrepresentations made during negotiations leading to written agreements, where the alleged misrepresentations concern a subject specifically dealt with in the agreements"); *Dayhoff Inc. v. H.J. Heinz Co.,* 86 F.3d 1287, 1299–1301 (3d Cir.1996) (affirming conclusion of district court that integration clause "bars any attempt to modify the terms of the agreement by reference to pre-agreement discussions or negotiations—that is, by prohibiting parol evidence"). By contrast, I believe that the Pennsylvania Supreme Court would not hold that a standard integration clause that was unaccompanied by other contractual language amounting to a clear anti-reliance clause bars a fraud claim premised on factual statements not contained in the written agreement when those statements do not contradict or vary any express term of the written agreement. *See, e.g., LaCourse v. Kiesel,* 366 Pa. 385, 77 A.2d 877, 881 (1951) (integration clause does not invoke parol evidence rule to bar fraudulent inducement claim based on extra-contractual statements because those statements did not "contract, vary or add to the terms of the agreement"). *Cf. Myers v. Rubin,* 399 Pa. 363, 160 A.2d 559, 561 (1960) (not specifically addressing integration clause but holding that parol evidence rule does not bar evidence of extra-contractual misstatements of fact that "were not to be incorporated into, nor in any way made part of, the agreement," and such statements may be grounds for rescinding a contract; "[t]here is a monumental distinction between a representation on a contractual item to be included in the written agreement and a representation made on something unconnected with the written agreement but constituting an inducement to the agreement"). Notably, in *CoreStates Leasing,* where a federal district court declined to apply the parol evidence rule to bar fraudulent inducement claims notwithstanding the presence of an integration clause, the alleged misrepresentations did not appear to concern a subject that was addressed in the contract at issue. *See CoreStates Leasing,* 1998 WL 151028, at *5–*8 (permitting evidence of alleged statements that lessee of medical equipment would receive certain insurance reimbursements even though he signed standard lease form containing integration clause).

*The Defendants' Other Arguments To
Defeat The Plaintiffs' Fraud
Claim Are Unavailing*

The defendants' primary argument to avoid summary judgment was based on the integration clause. They advance several other subsidiary arguments, which lack any real force. For example, the defendants contend that the fact that the Mt. Laurel and Northeast Studies were not what they were said to be is not material because they were not feasibility studies for CSP but only for two of the projects CSP was to develop. This argument is plainly insubstantial. In the Investment Proposal Katz gave the plaintiffs, he acknowledged that CSP's business plan was materially dependent on obtaining independent feasibility studies for its projects. It was those projects' success or failure that would determine whether CSP thrived.

■ Likewise, the defendants argue that the plaintiffs did not take reasonable steps to look into the feasibility studies by talking to JRV and seeing what role it played in the studies. This idea is a strange one. I see no reason why a prospective investor presented with a report that purports to be prepared by a respected industry source needs to call that source and verify that the report was not a plagiaristic misrepresentation.

■ As a final example, I point to the defendants' argument that plaintiffs Piliero and Rosenberg did not actually rely upon the bona fides of the Mt. Laurel and Northeast Studies but actually relied upon their fellow plaintiff Kronenberg. As noted previously, Katz knew that Piliero and Rosenberg were relying upon Kronenberg as a point person. Katz made sure that key documents such as the Investment Proposal and the Studies were transmitted to Piliero and Rosenberg, and he discussed the existence and importance of those Studies with Piliero. It was reasonable for them to rely on the existence of those Studies and to believe them to be what Katz said they were.

In sum, the record is clear that the elements of equitable (if not common law) fraud are established as a matter of law and that there is no genuine issue of material fact to the contrary. Had Katz informed the plaintiffs of the true nature of the Studies and of Robins's background, the plaintiffs would not have invested in CSP. By telling the plaintiffs that: i) the Mt. Laurel and Northeast Studies were prepared by a respected independent industry expert; and that ii) Robins was an experienced businessperson with a lengthy record of success, Katz hoped to convince the plaintiffs to invest. Because the first set of statements was false and the second set was materially misleading, and because the plaintiffs reasonably relied upon both sets of statements in making their investment decision, Katz and CSP are responsible to the plaintiffs to either return their investment proceeds or suffer a compensatory monetary damages award.

D. *The Plaintiffs Have Also Proved
Their Claim Under The Pennsylvania Securities Act*

As an alternative basis for relief, the plaintiffs have asserted a claim against the defendants under the Pennsylvania Securities Act. Section 1–401 of that Act, a general antifraud provision, states:

It is unlawful for any person, in connection with the offer, sale or purchase of any security in this State, directly or indirectly:

(a) To employ any device, scheme or artifice to defraud;

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to

make the statements made, in the light of the circumstances under which they are made, not misleading; or (c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.[47]

In pertinent part, § 1–501(a) of that Act reads as follows:

*Any person* who: ... (ii) offers or sells a security in violation of section[ ] 401 ... *or otherwise* by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the purchaser not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know and in the exercise of reasonable care could not have known of the untruth or omission, *shall be liable to the person purchasing the security from him, who may sue either at law or in equity to recover the consideration paid for the security* .... [48]

The genesis of and relationship between §§ 1–401 and 1–501 is somewhat complicated and has produced some confusion in court decisions interpreting those provisions. The Pennsylvania Securities Act is based on the 1956 Uniform Securities Act (the "Uniform Securities Act" or "Uniform Act"),[49] and § 1–401 of the Pennsylvania Act is modeled on § 101 of the Uniform Act.[50] Section 101, in turn, is based on SEC Rule 10b–5, promulgated under the federal Securities Exchange Act of 1934 (the "1934 Act"), which Rule is itself modeled on § 17(a) of the federal Securities Act of 1933 (the "1933 Act").[51]

Section 1–501(a) of the Pennsylvania Act is modeled on § 410(a)(2) of the Uniform Act,[52] which is in turn modeled on § 12(2) of the 1933 Act.[53] Importantly,

---

**47.** PA. STAT. ANN. tit. 70, § 1–401.

**48.** PA. STAT. ANN. tit. 70, § 1–501(a) (emphasis added).

**49.** *Osterneck v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 841 F.2d 508, 510 (3d Cir. 1988) ("The Pennsylvania Securities Act of 1972 ... is based on the Uniform Securities Act ...."), *overruled on different grounds, Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1988).

**50.** *See* 1 LOUIS LOSS & JOEL SELIGMAN, SECURITIES REGULATION 73 n. 114 (3d ed.1998) (indicating that § 1–401 of Pennsylvania Act is based on § 101 of Uniform Act).

**51.** UNIF. SEC. ACT OF 1956 § 101 cmt. (amended 1958), 7C U.L.A. 110 (2000).

**52.** *See* 9 LOUIS LOSS & JOEL SELIGMAN, SECURITIES REGULATION 4138 n. 17 (3d ed.1998) (indicating that § 1–501 of Pennsylvania Act is modeled on § 410 of Uniform Act).

**53.** UNIF. SEC. ACT OF 1956 § 410 cmt. (amended 1958), 7C U.L.A. 267 (2000) (official commentary to § 410(a)(2) of Uniform Act indicates that it was modeled on § 12(2)). 15 U.S.C. § 77l(a)(2), which codifies Section 12(2) of the 1933 Act (as amended) provides:

Any person who—
....
(2) offers or sells a security ..., by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,
shall be liable ... to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security ....

§ 1–501(a) is written in the disjunctive: It not only provides a civil remedy against "[a]ny person who ... offers or sells a security in violation of section[] 401," it also clearly provides that any person who "otherwise" violates the terms of § 1–501(a) itself "shall be liable to the person purchasing the security from him." Thus, whether or not a 10b–5–like remedy exists for violations of § 1–401—a point on which courts have reached conflicting conclusions despite the plain language of § 1–501(a) stating just that [54]— § 1–501(a) expressly creates a separate cause of action indirectly modeled on § 12(2) of the 1933 Act. Moreover, under § 1–703(a) of the Pennsylvania Act, I must construe § 1–501(a) in accordance with judicial interpretations of both § 12(2) of the 1933 Act and of states that have adopted § 410 of the Uniform Act.[55]

There are only a few disputes between the parties regarding the applicability of the Pennsylvania Securities Act to this dispute.

First, in a replay of an earlier argument, the defendants argue that the integration clause in the LLC Agreement bars the plaintiffs' § 1–501(a) claim because reasonable reliance is a required element under that statute. This argument is unavailing for several reasons. Initially, for reasons I have discussed in connection with the plaintiffs' fraud claim, the integration clause should not bar the plaintiffs from arguing that they reasonably relied on Katz's extra-contractual statements of fact for purposes of their Pennsylvania Act claim. As a result, even if § 1–501(a) requires a showing of reasonable reliance, the undisputed facts demonstrate that the plaintiffs have satisfied that requirement.

As important, § 1–507 of the Pennsylvania Securities Act states that any "condition, stipulation or provision binding any person acquiring any security to waive compliance with any provision of this act

15 U.S.C. § 77l(a)(2) (codifying as amended, Securities Act of 1933 § 12(2)).

**54.** At least one federal court has held that there is no implied right of action under § 1–401. *See In re Catanella & E.F. Hutton & Co., Inc. Sec. Litig.*, 583 F.Supp. 1388, 1439 (E.D.Pa.1984). That court relied on § 1–506 of the Pennsylvania Act, which states that "[e]xcept as explicitly provided in this act, no civil liability in favor of any private party shall arise against any person by implication from or as a result of the violation of any provision of this act or any rule or order hereunder." PA. STAT. ANN. tit. 70, § 1–506. *See also Biggans v. Bache Halsey Stuart Shields, Inc.*, 638 F.2d 605, 609 (3d Cir.1980) (citing § 1–506 and stating that "[t]he sole source of civil liability for any acts in violation of section[] 401 ... of the Pennsylvania Securities Act ... is found in section 501"), *overruled on different grounds, In re Data Access Sys. Sec. Litig.*, 843 F.2d 1537 (3d Cir.1988) (en banc). Other courts, by contrast, have held that § 1–401 does indeed create a remedy similar to that arising under Rule 10b–5, and have even gone so far as to suggest that this is the *only*

remedy available under the Pennsylvania Securities Act. I address these latter decisions in note 62, *infra*. I need not address the issue of whether a 10b–5–like remedy exists under § 1–401, however, since the plaintiffs have pled a claim under the terms of § 1–501(a) itself.

Frankly, the case law strikes me as unnecessarily confused. By its express terms, § 1–501(a) creates an express cause of action 1) for any violation of § 1–401—a cause of action similar to a federal 10b–5 claim; and 2) for the terms of § 1–501(a) itself—a cause of action identical to a federal § 12(2) claim. The mystifying judicial attempts to choose between these express remedies are inconsistent with the plain words of § 1–501(a) itself. "Or" means or.

**55.** *See* PA. STAT. ANN. tit. 70, § 1–703(a) ("This act shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact the 'Uniform Securities Act' and to coordinate the interpretation and administration of this act with related Federal regulation.").

... is void." [56] This nonwaiver provision is substantively identical to § 29(a) of the 1934 Act, which itself is substantively identical to a provision in the 1933 Act.[57] Recently, the United States Court of Appeals for the Third Circuit interpreted § 29(a) of the 1934 Act as preventing an explicit non-reliance clause in a contract from acting as an absolute bar to securities claims under Rule 10b–5 premised on statements not contained within the relevant agreement, holding that such a clause should simply be considered as a factor in determining whether the plaintiffs' reliance was reasonable.[58] Although this holding did not involve the Pennsylvania Securities Act, it did involve the interpretation of language substantively identical to § 1–507, comes from a source that is likely to be given great weight by the Pennsylvania Supreme Court, and is the best predictor of how that Court would interpret the Pennsylvania Securities Act if asked to determine whether an integration clause bars a § 1–501(a) claim seeking rescission of a contract for the sale of securities.

Lastly, as to the issue of reliance, § 1–501(a)'s own terms contain no reliance requirement. Although some decisions applying the Pennsylvania Act have read that statute as incorporating that requirement,[59] no decision of the Pennsylvania Supreme Court so holds. Given that § 1–501(a) was modeled on § 410(a)(2) of the Uniform Act, the Pennsylvania Supreme Court would likely look to decisions of other states interpreting the identical provisions in their versions of the Uniform Act. Those decisions generally hold that there is no reliance requirement, only a requirement that the plaintiff show that it was ignorant of the actual facts that it claims were withheld or misrepresented.[60] The decisions interpreting the Uniform Act are also consistent with federal decisions holding that § 12(2) of the 1933 Act grants "buyers a right to rescind without proof of reliance." [61] Because § 1–501(a) of the Pennsylvania Securities Act is so clearly modeled on § 410(a)(2) of the Uniform Act, and therefore § 12(2) of the federal Securities Act, it is likely that the Pennsylvania Supreme Court would interpret § 1–501(a) consistently with its statutory inspirations and not engraft a reliance

**56.** Pa. Stat. Ann. tit. 70, § 1–507.

**57.** Section 29(a) of the 1934 Act provides that "[a]ny condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void." See Securities Exchange Act of 1934 § 29(a), 15 U.S.C. § 78cc(a). The analogous provision in the 1933 Act is found in § 14 of that Act. See Securities Act of 1933 § 14, 15 U.S.C. § 77n.

**58.** AES Corp. v. Dow Chem. Co., 325 F.3d 174, 180–81 (3d Cir.2003).

**59.** See note 62 infra.

**60.** See Gohler v. Wood, 919 P.2d 561, 563, 566 (Utah 1996) (interpreting substantively identical provision of Utah's Uniform Securities Act as not requiring reliance and citing several decisions of other states' courts reaching a similar conclusion); Ritch v. Robinson–Humphrey Co., 748 So.2d 861, 862 (Ala.1999) (holding that Alabama's version of Uniform Act does not include causation requirement); Unif. Sec. Act of 2002 § 509 cmt. 4 (2002), 7C U.L.A. 69 (Supp.2003) (official commentary to § 509 of 2002 Uniform Securities Act stating that, unlike an implied cause of action under federal Rule 10b–5, claims arising under the precursor to § 509(b), i.e. § 410 of the 1956 Uniform Securities Act, have not been held to be dependent on a showing of reliance or causation).

**61.** Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 576, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). See also 9 Louis Loss & Joel Seligman, Securities Regulation 4202 n. 43 (3d ed.1998) (listing numerous federal court decisions holding that reliance is not an element of a § 12(2) claim).

requirement onto the statute, irrespective of whether certain federal district court decisions purport to do so.[62]

In any event, as I have discussed, even if there is a reliance requirement in § 1–501(a), the uncontroverted record demonstrates the plaintiffs' satisfaction of it.

■ The next argument made by the defendants is a similar one. This argument involves the contention that scienter is a required element of a claim under § 1–501(a). The problem with that argument is that it is refuted by the language of § 1–501(a) itself, which enables recovery for the plaintiff (assuming all other elements are proven) unless the defendant can "sustain the burden of proof that he did not know and in the exercise of reasonable care could not have known of the untruth or omission." [63] Thus, in *Brown v. Erie Compressor Co.*,[64] the Pennsylvania Court of Common Pleas noted that a buyer in a § 1–501(a) case "need not prove scienter," but is at risk of not recovering if the seller can meet its affirmative burden to show that it did not and could not in the exercise of reasonable care know of the "untruth or omission." [65] This decision ac-

---

**62.** For example, in *Pell v. Weinstein*, 759 F.Supp. 1107, 1115 (M.D.Pa.1991), *aff'd*, 961 F.2d 1568 (3d Cir.1992) (TABLE), a federal district court concluded that reliance was required for all of the plaintiffs' fraud claims, including a claim under the Pennsylvania Securities Act. Although the court discussed a separate claim under § 12(2) of the federal Securities Act, the court's decision did not discuss the relationship between §§ 1–401 and 1–501 of the Pennsylvania Act and § 410 of the Uniform Act or § 12(2) of the 1933 Act. *Pell* and decisions like it analogize § 1–401 to Rule 10b–5, and conclude that a cause of action under the Pennsylvania Securities Act must contain similar elements to those in a 10b–5 claim. *See, e.g., McFeeley v. Florig*, 966 F.Supp. 378, 382 & n. 8 (E.D.Pa.1997) (stating that "the anti-fraud provisions of the Pennsylvania Securities Act and the 1934 Securities Exchange Act are functionally identical" and that "Section 1–401 substantially echoes Rule 10b–5's language"); *Goodman v. Moyer*, 523 F.Supp. 35, 38–39 & n. 8 (E.D.Pa. 1981) (indicating that there was no "determinative case law" regarding the elements for a claim under § 1–401 of the Pennsylvania Securities Act and suggesting that § 1–401 is analogous to Rule 10b–5). But, as previously indicated, those cases generally fail to recognize the import of the fact that § 1–501(a) expressly creates an independent cause of action governed by the provisions of § 1–501(a) itself. Because the progenitor of those provisions is § 12(2) of the 1933 Act, the elements of a § 1–501(a) claim should be identical to those of a § 12(2) claim. Thus, regardless of whether a claim under § 1–401 (via § 1–501(a)) exists that requires the same elements as a 10b–5 claim, including reliance, a plaintiff could still bring a separate claim under § 1–501(a) without a showing of reliance.

**63.** Pa. Stat. Ann. tit. 70, § 1–501(a).

**64.** 59 Erie County L.J. 134 (Pa.Ct.Com.Pl. 1976).

**65.** *Id.* at 137 (quoting § 1–501). Another decision of the Pennsylvania Court of Common Pleas purports to reject *Brown v. Erie Compressor Co.* in favor of the analysis of *Goodman v. Moyer*, discussed in note 62, *supra*, which held that scienter must be proved to state a claim under the Pennsylvania Securities Act. *Engle v. Cassell*, 44 Pa. D. & C.3d 301 (Pa.Ct.Com.Pl.1986). Not only was the judgment in *Engle* vacated by the Superior Court, *Engle v. Cassell*, 365 Pa.Super. 650, 526 A.2d 818 (1987) (TABLE), but, with all due respect to the Court of Common Pleas, that court, while recognizing that § 1–501 is indirectly modeled on § 12(2), misstated the holding of a United States Supreme Court decision interpreting § 12(2). Specifically, *Engle* stated that *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), held that "scienter is required for recovery under the Federal Act." *Engle*, 44 Pa. D. & C.3d at 314. But, in fact *Ernst* held that scienter was required to state a claim under § 10(b) of the 1934 Act and Rule 10b–5, not under § 12(2) of the 1933 Act, and actually supported that holding by noting that § 12(2) "allow[s] recovery for negligent conduct." *Hochfelder*, 425 U.S. at 188 & n. 27, 96 S.Ct. 1375.

cords with the well-reasoned authority interpreting § 410 of the Uniform Act and § 12(2) of the 1933 Act, which have nearly identical language.[66]

◼ By virtue of the plain language of § 1–501(a), the defendants may only escape summary judgment if they point to record evidence suggesting a rational inference · that they could not have known about the false and misleading nature of their statements to the plaintiffs had they exercised reasonable care. The defendants have failed to meet this burden. As to the Mt. Laurel Study, Katz was aware that Robins and he had prepared and written almost all of it, was aware that the Study was therefore not independent, and that the Study was therefore not what it purported to be or what he had represented to the plaintiffs that it was. Katz's indications at his deposition that he was unaware of just how little JRV had done to review the Mt. Laurel Study that Robins and he had drafted does nothing to show that he was ignorant of the facts that JRV had not drafted it and that it was drafted by EnterSport, an entity that was obviously not independent. And it is equally obvious that Katz, had he exercised reasonable care, would have found out that JRV did very little work on the Mt. Laurel Study and, in particular, had not reviewed the

material changes made to the Study in 2000.

As to the Northeast Study, the defendants' failure to meet the statutory burden is even more obvious. There is no evidence that JRV had any role in this Study despite the fact that the document is purportedly signed by and written by Vivian. Katz knew that JRV did not have time to write the Mt. Laurel Study even though it was being paid to do so, and therefore subcontracted with EnterSport to complete that Study. There is no contract with JRV to do a Northeast Study. Someone as savvy and involved as Katz acting with reasonable care would have known that JRV would not write the Study in exchange for no compensation. Katz was surely in a position to know that the Northeast Study had been written with no involvement at all from JRV, since he could have taken reasonable steps to make sure that a Study that he was representing as being written by an independent consultant was in fact written by that consultant. A good starting point towards the procurement of an independent feasibility study is the retention of the consultant by contract to write the study.

Similarly, the defendants have not met their burden to show that Katz could not

---

**66.** *See, e.g.,* 79A C.J.S. *Securities Regulation* § 429, at 471–472 (1995) (citing § 410 of Uniform Act and stating that scienter is not an element of a cause of action for material misrepresentations or omissions under the Uniform Act or state securities acts); 69A Am.Jur.2d *Securities Regulation—State* § 168 (2003) ("Although the antifraud provisions of the Uniform Securities Act . . . were modeled after Securities and Exchange Commission Rule 10b–5, it has been said that the civil liability provisions of the Uniform Securities Act . . . concerning fraudulent representations and omissions, were modeled after § 12 of the [1933] Securities Act and that federal interpretations of that provision are useful in interpreting the blue sky provisions." (foot-

notes omitted)); 1 Thomas Lee Hazen, The Law of Securities Regulation § 7.6[1], at 622 (4th ed. 2002) ("[A]s compared with Rule 10b–5 which would give the injured purchaser an implied right of action under the 1934 Act, section [12(2)] liability does not require scienter. Section [12(2)] renders the seller liable if he or she 'shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission.' . . . . It is clear that section [12(2)]'s requirement of 'reasonable care' imparts some sort of negligence standard and that it is not necessary for the purchaser to show any type of scienter on the seller's part.").

have discovered the true facts of Robins's background had he exercised reasonable care. Had Katz performed a simple reference check when he hired Robins, he would have soon discovered that Robins's background was not as Robins represented. Instead, Katz hired Robins without checking to see whether his employment and education experience were as Robins said. Katz's only retort is to point to cases holding that an employer who hired an employee without performing a criminal background check is not liable in tort to third parties who are later injured by that employee unless the plaintiff shows that the employer was negligent in hiring or supervising the employee.[67] These cases generally do not involve a situation when the employer misleadingly misrepresented the employee's background in order to induce action by the plaintiffs and their reasoning must be viewed contextually, as a policy-based exercise in line-drawing about the limits of the duties owed by employers to third parties.[68] None of them involve § 1–501(a) of the Pennsylvania Securities Act, which places an affirmative burden on a party making false statements in connection with the sale of securities to prove he could not have known of the statements' falsity through the exercise of reasonable care. Their reasoning should not and cannot be read as creating a new safe harbor for employers who make misrepresentations in connection with the sale of securities.

As important, it is not clear what reasonable care means in the context of hiring a top executive who will exercise fiduciary duties if it does not include some form of minimal resume-checking. Here, all Katz had to do was to conduct a cursory check of Robins's employment experience to find out that Robins was not as Katz had advertised to the plaintiffs. Once Katz

---

67. *See Estate of Southerland v. Oakwood Mobile Homes, Inc.*, 1997 WL 1737118, at *6–7 (Del.Ct.Com.Pl. Sept. 8, 1997) (holding that mobile home company was not liable for negligently hiring or supervising salesman who defrauded plaintiffs by accepting payment for, but failing to fully perform, contract to provide additional services and improvements to plaintiffs' property in connection with purchase of mobile home because employer did *not know or have reason to know that sales-*man had a "particular unfitness, incompetence or dangerous attributes," but concluding that employer was vicariously liable for employee's fraud by virtue of principal-agent relationship); *Brezenski v. World Truck Transfer, Inc.*, 755 A.2d 36, 39, 43 (Pa.Super.2000) (holding that employer was not vicariously liable for employee's shooting of motorist and homeowner and was not liable for negligent hiring and retention of employee, and noting that "it is doubtful that a more thorough screening would have revealed" employee's medical history suggesting propensity to commit crimes).

68. In *Heller v. Patwil Homes, Inc.*, 713 A.2d 105, 109 (Pa.Super.1998), the only case to even come close to supporting the defendants' argument, the court held that a real estate company was not liable on a negligent hiring theory for failing to investigate the background of a salesman who defrauded the plaintiff homebuyers in an investment scheme even though a background check would have revealed that the salesman had earlier engaged in investment fraud. That case did not involve a claim under the Pennsylvania Securities Act, and, aside from a "positive report" from a part-time employee at the company to the plaintiffs about the salesman's employment and family history, there was no suggestion that the employer had made any affirmative statements regarding the salesman's credentials of any kind. The court concluded that the employer was not liable for negligent hiring because the "discovery of his involvement in securities fraud may not have discouraged his employment in the unrelated real estate sales market," *id.*, and certainly did not purport to establish some broad rule that an employer can never be liable under any circumstances for failing to perform a background check. Moreover, the defendant was actually held liable for its employee's fraud because it had failed to supervise him properly. *Id.*

probed a bit, Robins's true track record would have been quickly revealed. Given that Katz was holding out Robins as a person qualified to perform in an important fiduciary position, reasonable care required that he take some steps to ensure that his confidence in Robins and his representations of fact regarding Robins's credentials were not misplaced. Katz did not take any action of this kind and did not act with reasonable care.

In sum, the plaintiffs have met their burden to show that no genuine dispute of material fact precludes the entry of summary judgment in their favor for their § 1–501(a) claim.

### E. The Record Warrants The Entry Of An Immediate Order Of Rescission

■ Under both the common law of fraud and the Pennsylvania Securities Act, the plaintiffs may seek either rescission or monetary damages. Their preference is an order of rescission rescinding the transaction by which they paid $2.1 million in order to purchase membership interests in CSP. The plaintiffs argue that the record is ripe for entry of an order requiring CSP and Katz to return to the plaintiffs the $2.1 million they invested in CSP. The plaintiffs are willing to tender back their membership interests in CSP, thus completely rescinding the economic features of their relationship with the defendants.

■ In response, the defendants make two arguments. The first is that the plaintiffs have failed to formally tender back their CSP membership interests. It is clear, however, that rescission can be ordered so long as the plaintiffs have offered to return their membership interests upon entry of an order of rescission.[69]

The second argument is that the court should delay its order of rescission until it has adjudicated the amount that CSPII owes CSP and considered the adverse effect that Piliero's refusal to cause CSPII to repay CSP in the autumn of 2001 had on CSP's fortunes. When first considered, this request had more appeal than a deeper look revealed.

Essentially, the defendants argue that CSP might have been viable had CSPII infused sufficient cash into CSP in late 2001. The problem with this contention is that the record does not support a rational finding to that effect. Instead, the record contains overwhelming and uncontroverted evidence that CSP was hopelessly impaired. Given Robins's then-ongoing conduct, Robins's past record, and the misleading nature of the various "independent studies" CSP had disseminated to unwitting recipients, it was only a matter of time until CSP's credibility and therefore viability were eviscerated. When the premise of a business is to convince public officials to put their government's bonding

---

**69.** By seeking rescission in their complaint, the plaintiffs effectively offered to give back their CSP membership interests once an order of rescission was entered. Under Delaware law, the defendants concede that this proffer is sufficient. Although the defendants do not concede this point under Pennsylvania law, the plaintiffs' filings in this case constitute a sufficient tender of their units to enable an order of rescission under the law of that commonwealth. See, e.g., Keenheel v. Commonwealth, 134 Pa.Cmwlth. 494, 579 A.2d 1358, 1362 (1979) (holding that failure of petitioner to make formal tender was not fatal to his rescission claim, as court had equitable power to condition any future order of rescission on petitioner's tender); Vogel v. Trahan, 1980 WL 1378, at *11 (E.D.Pa. Jan.11, 1980) (denying motion to dismiss claim under § 12(2) of federal Securities Act "[b]ecause the sole purpose for the tender is to effect rescission, [and] a tender prior to or during the trial should be as acceptable as one prior to the complaint."); see also PA. STAT ANN. tit. 70, § 1–501(a) ("Tender shall require only notice of willingness to exchange the security for the amount specified.").

authority on the line, the credibility of the promoter is obviously critically important.

While CSP should receive back from CSPII what it is owed for its transfer of the Mt. Laurel assets—and will receive that after an evidentiary hearing settles that amount—there is no equitable basis to deny the plaintiffs full restitution of the funds they were misled into investing into CSP and an order requiring rescission will be entered. The question of what, if any, interest payments should be required in connection with rescission will be deferred in the interests of efficiency until trial on CSP's counterclaim regarding the Mt. Laurel transfer. Put simply, the plaintiffs are entitled to a remedy of rescission but that relief will be contained in a later order of rescission, the details of which will be worked out in connection with a comprehensive final order that will be issued after determination of the remaining claims in the case.

II. *The Defendants' Claim For Breach Of The Confidentiality Provision Of The LLC Agreement Cannot Survive The Plaintiffs' Motion For Summary Judgment*

The final claim this opinion must consider is the counterclaim brought by Katz and EnterSport for violation of the "Confidentiality Provision" in the LLC Agreement. That Provision states as follows:

> GP 14.1 *Sensitive Information.* The Company and each of its Members, Managers and officers at all times (including after he, she or it is no longer a Member, Manager, officer or indemnified representative) shall use all reasonable efforts to cause all Sensitive Information to be maintained in strict confidence, protected and safeguarded and shall not directly or indirectly disclose, reveal or make available to any

third party any Sensitive Information or use or exploit any Sensitive Information for any purpose whatsoever. Notwithstanding the preceding sentence, nothing herein shall prevent the Company, a Member, a Manager, an officer or other indemnified representative from disclosing or using Sensitive Information as necessary and appropriate to protect or enforce rights under this Agreement or any other agreement with or relating to the Company or as necessary to comply with Applicable Law (including disclosing Sensitive Information to the extent necessary to comply with a proper discovery request, subpoena or other similar legal process), provided that the Person proposing to disclose or use Sensitive Information in connection with any suit, arbitration, action or other proceeding shall seek, and afford any other affected party the opportunity to seek, an order to hold the contents of all pleadings and other documents containing Sensitive information under seal or other reliable assurance that confidential treatment will be accorded to the Sensitive Information.[70]

The LLC Agreement earlier defines "Sensitive Information" in the most capacious manner one could imagine:

> *"Sensitive Information"* means all information relating to the existence of or any claim made in connection with any dispute or controversy arising under this Agreement or relating to the Company or the rights, powers or duties of any of the Members, Managers[,] officers or other indemnified representatives (including any claim asserted by a Member against the Company, another Member, a Manager, an officer or other indemnified representative, and including any

---

70. *Agreement Ex. C § 14.1.*

dispute or controversy relating to an indemnified representative's right to indemnification, contribution or advancement of expenses hereunder), including all correspondence and other communications relating to such a dispute or controversy and all pleadings filed and information exchanged in the discovery phase of any suit, arbitration or other action or proceeding of any kind involving such a dispute or controversy and the record of any such suit, arbitration or other action or proceeding.[71]

Katz and EnterSport claim that the plain language of § 14.1 was violated when the plaintiffs filed this lawsuit publicly and without attempting to file it under seal. As a person seeking public office at the time the lawsuit was filed, Katz claims he was injured by having the plaintiffs air the dirty laundry of this dispute in the midst of his run for Mayor. For its part, EnterSport—which is essentially moribund—claims that its ability to do business was injured by the public revelation of the plaintiffs' charges.

The dispute about this issue is not a new one in this litigation and has occupied much of the parties' and the court's time, especially when the defendants' attempt to keep virtually every aspect of this case under seal was challenged by the media and by a political opponent of Katz last autumn. Their motions to unseal the record were granted in an oral opinion.[72]

Because the issue can be dealt with straightforwardly, I resist the temptation to cover all the ground the parties do in their briefs on this issue. I content myself with a few points sufficient to resolve the pending motion for summary judgment after providing the necessary factual background.

A. *The Factual Record Relevant To The Defendants' Argument That The Plaintiffs Breached The Confidentiality Provision*

There is no dispute that the Confidentiality Provision was sought by the entities controlled by Katz in negotiating the CSP LLC Agreement. Originally, Katz and his entities wanted a mandatory arbitration provision requiring all disputes among the parties to the LLC Agreement to be resolved in private arbitration. The plaintiffs refused to agree and demanded the option to litigate disputes in court. What resulted was the Confidentiality Provision.

What also emerged from the negotiations is an LLC Agreement to which Katz is not a party. Rather, his controlled entity, EnterSport, was a party. Thus, though it is clear that the Confidentiality Provision is one that Katz sought, he himself is not a signatory to the LLC Agreement. That is important because the LLC Agreement plainly states:

> GP 18.7 *No Third–Party Rights. Except as expressly provided herein,* this Agreement is not intended to, and it shall not, provide any rights whatsoever to any person who or entity which is not a party hereto (*including any* spouse, creditor or *employee of a party, or any others who may have a stake or interest in such party or in this Agreement* ) and such other persons and entities shall have no right to enforce this Agreement directly or derivatively (through their relationship to a party hereto or otherwise) against any party hereto.[73]

---

**71.** Agreement Ex. C § 1, at 8.

**72.** *See* Answering Br. in Opp'n to Pls.' Mot. for Summ. J. on Pls.' Claim for Rescission &

Defs.' First & Third Countercl. Ex. C (Transcript of Oral Ruling, dated Oct. 24, 2003).

**73.** Agreement Ex. C § 18.7 (emphasis added).

When the relationship between the plaintiffs and Katz became strained, there was discussion of settling their dispute outside of court. That did not work and the record reveals that Katz realized that the plaintiffs would likely sue him. The plaintiffs then did so and did not seek to place their complaint under seal. Katz got the complaint within a day of its filing but did not move to place it under seal. Instead, twenty days later Katz filed an extensive answer that he did not attempt to place under seal. Although Katz later took the position that the filing of the complaint in public was a breach of the Confidentiality Provision, and attempted for his own part to keep as much of the record sealed as possible, Katz also spoke to third parties about this dispute and to the press. In statements to the press, Katz made harsh accusations against the plaintiffs, which attacked their integrity and the truthfulness of the allegations they made in this lawsuit.

At no time during this litigation has Katz articulated what, if anything, contained in the plaintiffs' complaint reveals a trade secret, an issue of personal privacy, or some other matter that would traditionally rise to the level of sensitivity that would justify a judicial order permitting the relevant aspects of filings to be placed under seal. At most, Katz argues that the claims of wrongdoing against him exposed him to negative scrutiny, a reality that comes with the territory of being sued as a defendant in a court of law, particularly in cases when the defendant is a fiduciary.

With that background in mind, I now resolve the parties' cross-motions for summary judgment addressed to the Confidentiality Provision.

### B. *Katz Has No Standing To Allege A Breach Of The Confidentiality Provision*

 The Confidentiality Provision claim was initially brought solely by Katz. The problem for Katz is that whatever his subjective expectations, he failed to obtain an LLC Agreement that made him a beneficiary of the Confidentiality Provision.[74] By its plain language, the LLC Agreement excludes Katz from benefiting from the Confidentiality Provision unless that Provision "expressly provide[s]" that he shall benefit from it.

But that Provision does not expressly provide for Katz to benefit from its terms and therefore the plain language of the LLC Agreement precludes Katz's attempt to claim third-party beneficiary status. Moreover, Katz's strained attempt to claim that he is a "representative" of EnterSport for purposes of § 18.6 of the LLC Agreement is without merit.[75] Section 18.6 ex-

---

74. Of course, a nonparty to a contract ordinarily has no rights under that contract. The exception is when the nonparty can demonstrate that it was a third-party beneficiary of the contract. *See, e.g., Insituform of N. Am., Inc. v. Chandler,* 534 A.2d 257, 268 (Del.Ch. 1987). But the parties may also expressly provide that a nonparty shall not have any rights as a third-party beneficiary, as they have done here.

75. Section 18.6 of the LLC Agreement provides:

GP 18.6 *Binding Effect.* This Agreement shall be binding upon and insure to the benefit of the parties hereto and their re-spective heirs, executors, representatives, successors and permitted assigns. It is expressly understood and agreed that this Agreement shall apply to and govern any legal guardian, personal representative or other fiduciary of a party, who shall act on behalf of the party to fulfill his, her or its obligations hereunder. All references herein to the "Company" shall include any successor to substantially all of the assets or business of the Company, whether by a merger, consolidation, sale of assets, conversion, recapitalization, reorganization, liquidation, sale or issuance of securities or any other transaction of similar substantive effect.

ists to make sure that the LLC Agreement "bind[s] ... and inures to the benefit" of parties' heirs or other successors, including the fiduciaries—e.g., "executors" and "representatives"—through whom the successors (e.g., estates) act. Katz's claim that he is a representative of EnterSport is without any foundation in law. At oral argument, Katz's counsel admitted that under the Delaware General Corporation Law, EnterSport can act only through officers and directors and that the term "representative" is not a recognized corporate position under the DGCL. Katz's status as an officer, director and stockholder of EnterSport did not make him a "representative" under § 18.6; rather it places him within that category of persons in § 18.7 ("spouse[s], creditor[s], or employee[s] of a party, or any others who may have a stake or interest in such party or in this Agreement") who have no rights under the LLC Agreement unless there is explicit contractual text providing such rights. In this regard, Katz's citation of sections of the Agreement that require CSP to indemnify its managers in certain situations does not aid him, as those sections demonstrate an explicit conferral of a benefit in the form of a contractual entitlement to receive protection that easily satisfies the requirement for an express provision of beneficiary status. By contrast, the Confidentiality Provision is devoid of any express provision benefiting Katz or other officers and directors of the actual parties to the LLC Agreement.

### C. Because Neither Katz Nor EnterSport Have Suffered Compensable Damages, Summary Judgment Against Them Is Appropriate

 Realizing that his own standing to seek relief for a breach of the Confidentiality Provision was questionable, Katz caused EnterSport to join this suit as a counterclaim-plaintiff to allege an identical claim. The problem for Katz (if he has standing) and EnterSport [76] is that there is no record evidence that supports a rational conclusion that they suffered cognizable damages, and a breach of contract claim under Delaware law requires a showing of compensable injury.[77]

The reason there is no compensable injury is easy to state. Although the plaintiffs clearly breached the plain language of the Confidentiality Provision by failing to seek to file their initial complaint under seal at least provisionally until EnterSport could try to convince the court to allow the complaint to remain under seal during the pendency of the litigation and the later period contemplated by our relevant court rule of procedure, Rule 5(g), the LLC Agreement did give the plaintiffs the right to file a lawsuit in a court of public record. As a result, the parties to the LLC Agreement knew that the nature of any dispute

---

Agreement Ex. C. § 18.6.

**76.** The plaintiffs argue that because EnterSport was not sued in the complaint, it was not an "affected party" for purposes of the Confidentiality Provision. I decline to rest my grant of summary judgment on that ground. If the complaint, for example, contained proprietary information regarding CSP (or EnterSport), EnterSport might well have been affected regardless of whether it was named as a party. Here, the problem is that, like Katz, EnterSport cannot point to anything in the complaint that is of a commercially sensitive nature that would have justified judicial sealing and cannot point to any record evidence of injury to itself as a commercial entity.

**77.** *E.g., Great Lakes Chem. Corp. v. Pharmacia Corp.,* 788 A.2d 544, 549 (Del.Ch.2001); *Winston v. Mandor,* 710 A.2d 835, 840 (Del.Ch. 1997). *Cf. Dalton v. Ford Motor Co.,* 2002 WL 338081, at *6 (Del.Super.Feb.28, 2002) ("[T]he judicial system is not required to entertain actions where plaintiffs have not suffered any damages.").

among themselves would become public unless the dispute involved matters of such commercial or personal sensitivity as to justify placing the entire record under seal—an eventuality that is highly improbable when the dispute simply involves accusations of wrongdoing among business partners.

 In this court, for example, the tradition of open proceedings is reflected in Rule 5(g) itself, which places strict limits on parties' ability to maintain filings under seal.[78] Even when aspects of certain briefs or letters are sufficiently sensitive to be placed under seal, Rule 5(g) requires that the remainder of the brief or letter be made publicly available.[79]

This aspect of our Rules is an important one because it reflects Delaware's commitment to the principles of open government reflected in the First Amendment to the United States Constitution, and in Delaware's common law.[80]

78. *See, e.g.,* Ct. Ch. R. 5(g)(1) ("Except as otherwise provided in this Rule 5(g), all pleadings and other papers, including deposition transcripts and exhibits, answers to interrogatories and requests for admissions, and affidavits or certificates and exhibits thereto ('documents') filed with the Register in Chancery shall become a part of the public record of the proceedings before this Court."); Ct. Ch. R. 5(g)(2) ("Documents shall not be filed under seal unless and except to the extent that the person seeking such filing under seal shall have first obtained, for good cause shown, an order of this Court specifying those documents or categories of documents which should be filed under seal ....").

79. Ct. Ch. R. 5(g)(4).

80. *See* Arthur R. Miller, *Confidentiality, Protective Orders, and Public Access to the Courts,* 105 HARV. L.REV. 427, 429 (1991) ("[T]he right of public access to court proceedings and records .... exists to enhance popular trust in the fairness of the justice system, to promote public participation in the workings of government, and to protect constitutional guarantees."). *Cf. In re IBP, Inc. S'holders Litig.,* 793 A.2d 396, 408 (Del.Ch.2002) ("In this republican democracy, our citizens place great value on public decisionmaking and on the rule of law."). For a sampling of cases stating the established proposition that the First Amendment to the United States Constitution has been interpreted to create a general right of public access to judicial proceedings and/or records, including those involving civil disputes, see, for example, *Westmoreland v. Columbia Broadcasting System, Inc.,* 752 F.2d 16, 23 (2d Cir.1984) ("[T]he First Amendment does secure to the public and to the press a right of access to civil proceedings ... because public access to civil trials en- hances the quality and safeguards the integrity of the factfinding process, fosters an appearance of fairness, and heightens public respect for the judicial process, while permitting the public to participate in and serve as a check upon the judicial process—an essential component in our structure of self government." (internal citations omitted)); *Publicker Industries, Inc. v. Cohen,* 733 F.2d 1059, 1070 (3d Cir.1984) ("Public access to civil trials, no less than criminal trials, plays an important role in the participation and the free discussion of governmental affairs. Therefore, we hold that the First Amendment embraces a right of access to civil trials to ensure that this constitutionally protected discussion of governmental affairs is an informed one." (internal citations and modifications omitted)). *See also Rushford v. New Yorker Magazine, Inc.,* 846 F.2d 249, 253–54 (4th Cir.1988) (discussing First Amendment and common law right of access to judicial documents in civil trials); *Brown & Williamson Tobacco Corp. v. FTC,* 710 F.2d 1165, 1177–81 (6th Cir.1983) (discussing historical and philosophical underpinnings of First Amendment and common law right of access and vacating order of district court sealing documents); *In re Continental Ill. Sec. Litig.,* 732 F.2d 1302 (7th Cir.1984) (holding that district court did not abuse discretion by granting public access to certain evidence in civil proceeding because presumption of public access applied and was not rebutted); *Newman v. Graddick,* 696 F.2d 796, 803–04 (11th Cir.1983) (reversing district court decision denying application to inspect and copy certain judicial records because presumption of access was not rebutted). For authority for the proposition that the common law of Delaware also affords the public a presumptive right of access to judicial proceedings, including in civil cases, see,

By its own terms, the Confidentiality Provision is facially absurd. Although recognizing that the parties are free to litigate in courts of public record, the Provision purports simultaneously to make even the existence of a dispute of any nature among the parties "Sensitive Information" that the parties must endeavor to conceal from the public.

The problem that Katz and EnterSport face is that a court, such as this one, cannot indulge the desire of private parties to be self-created "secret citizens" who can litigate in courts of public record behind a judicially enforced screen. Undoubtedly, if sanctioned, the ability of persons and entities of prominence to contractually procure protection against the adverse publicity that attends litigation would have widespread commercial appeal. Secret citizens could use publicly funded courts as they wished, secure in the knowledge that no one would know about the record in the cases involving them—or arguably, that the cases involving them even exist! The difficulty for persons seeking secret-citizen status is that their desires confront an insuperable barrier in most American courts, and certainly in this one—which is the legal duty of the tribunal to honor the legitimate interest of the public and the press in access to judicial proceedings.

■ Another related problem arises from contractual undertakings like the Confidentiality Provision. Because it is necessary for the judiciary to protect the legitimate privacy and commercial interests of litigating parties, it is·understood that reasonable limitations can be placed on public access to judicial records. This enables courts to handle sensitive matters such as child custody and trade secret disputes without subjecting the parties to unwarranted embarrassment or competitive injury. But, if trial courts permit the sealing of (all or part of the record of) a judicial proceeding simply because the parties wish to conceal their dispute or because the parties take an unreasonably broad view of what matters are truly confidential, they risk injuring the public's right of access and generating appellate decisions that constrain trial courts not only from sealing judicial records when there is no justification for doing that, but that thereby make it more difficult for trial courts to protect truly sensitive information from public disclosure, when that protection is genuinely warranted.

This case is· a good example of that potential risk. Here, Katz and EnterSport have been invited repeatedly to identify particular aspects of the judicial record that would justify sealing under the traditional standards of confidentiality used by commercial parties in litigating in this court. But they have been unable to point to anything that is confidential in that sense because nothing in the record involves, for example, trade secrets or competitively sensitive pricing information.[81]

for example, *C. v. C.,* 320 A.2d 717, 723 (Del. 1974) ("In general, a member of the public has a right to access to judicial records [at] common law if he has an interest therein for some useful purpose and not for mere curiosity."); *Cantor Fitzgerald, Inc. v. Cantor,* 2001 WL 422633, at *1 (Del.Ch. Apr.17, 2001) ("United States' citizens have a fundamental right to be informed of the operations of government and to an open court system. This right translates into a presumption that the press and public have a right of access to judicial documents and records. This concept is known as the Common Law Right of Access and is adopted or acknowledged in Court of Chancery Rule 5(g)." (internal citations omitted)).

81. *Cf. Sullivan v. Hammer,* 1990 WL 60767, at *1 (Del.Ch. May 4, 1990) (keeping deposition testimony under seal where it was "analogous to testimony about a trade secret, confidential research development or commercial information").

Nor does the record contain personally sensitive information involving Katz's private life.[82] To sanction sealing under these circumstances would therefore create a precedent that would permit sealing in virtually all of this court's cases.

 Given that reality, the plaintiffs' failure to seek to have the complaint filed under seal cannot give rise to compensable damages for an obvious reason: The court would not have permitted the entire complaint to remain under seal even if the plaintiffs had asked the court to give the defendants the opportunity to seek a judicial order placing that document under seal. Once this court applied the appropriate standards, the complaint would have been promptly unsealed—which is what happened when a motion to unseal the other parts of the record was made last autumn. The mere fact that a defendant in a business case is accused of wrongdoing and that he would prefer for the public not to know about those accusations does not justify the sealing of the complaint; otherwise, most of this court's docket would be under seal. Therefore, Katz and EnterSport are claiming damage from the public revelation of information that would have become public even had the plaintiffs complied with the Confidentiality Provision. For that reason, it would be sheer speculation to award damages based on the dissemination of information about the lawsuit somewhat earlier than would have

been the case had the plaintiffs complied with the Confidentiality Provision in filing.[83] Under Delaware law, plaintiffs must prove their damages with a reasonable degree of precision and cannot recover damages that are "merely speculative or conjectural." [84]

In this respect, the record also reveals that the only injury Katz and EnterSport claim is the injury to their reputation because the plaintiffs made accusations of wrongdoing against Katz in a complaint. Katz has not filed a motion under Rule 11 claiming the complaint was frivolous, however. All he has done is claim that the plaintiffs' accusations are unfounded and cursorily alleged that this injured his run for Mayor and his reputation as a businessman. That is, all Katz has alleged is that he has faced the common problem of any person accused of commercial wrongdoing in a court of public record, which is that some people will believe the plaintiffs' accusations and not the defendant's denial.

In the discovery record, Katz has failed to proffer any tangible evidence of concrete damage. By his own words to the press, he has attributed his loss in the Mayoral race to events other than this lawsuit. And Katz refused to answer discovery that would have shed light on exactly what damages he was claiming, a failure that was prejudicial to the plaintiffs and that illustrates the insubstantial nature of his claim of injury. At his deposition, Katz was equally unhelpful and

---

82. In his deposition, Katz did testify about his income for certain years. Even this testimony might not be confidential as much of his income came from his salary with a quasi-public corporation and he gave the press access to inspect his tax returns.

83. Katz argues alternatively that he would have settled the case had he been given the opportunity to do so before the dispute became public. But he has produced no evidence that he made a serious settlement offer during the negotiations whose breakdown

preceded the filing of the suit, a breakdown Katz knew was likely to lead to a suit. The speculative possibility that Katz might have offered settlement consideration (that he has never identified) and that it (that never identified consideration) might have been accepted by the plaintiffs involves pure speculation unsupported by any record evidence.

84. *Laskowski v. Wallis,* 205 A.2d 825, 826 (Del.1964) (quoting *Henne v. Balick,* 146 A.2d 394, 396 (Del.1958)).

unspecific.[85] Likewise, EnterSport has proffered no evidence of balance-sheet or other commercial injury as a result of the somewhat-earlier revelation of the complaint in this action. Indeed, the record contains an admission by Katz before the filing of the suit that EnterSport was not an active entity and existed solely to hold Katz's interest in CSP. Like Katz, EnterSport also failed to provide discovery or other record evidence justifying its assertion of injury.

Therefore, given that the information that became public would have become public even had the plaintiffs complied with the Confidentiality Provision, given the failure of Katz and EnterSport to provide relevant discovery regarding their damages claim, and given the wholly conclusory and speculative allegations of injury made by them, the plaintiffs' motion for summary judgment shall be granted.[86]

### Conclusion

For the foregoing reasons, the plaintiffs' motion for summary judgment on their fraud in the inducement claim and their Pennsylvania Securities Act claim is granted, and the defendants' cross-motions on those claims are denied. The remedy for those claims shall be an award of rescission, which shall become effective upon, and the precise contours of which shall be determined by, a further order to be entered when the remainder of the case is adjudicated. Furthermore, the plaintiffs' motion for summary judgment on those counts of the defendants' counterclaim dealing with the Confidentiality Provision is granted and the defendants' cross-motions regarding those counts are denied.

Finally, the plaintiffs are entitled to summary judgment on certain undisputed issues per the parties' agreement and CSP is entitled to receive, after trial, funds from CSP II relating to the Mt. Laurel sales transaction. The parties shall prepare an implementing order and submit it within ten days.

---

85. Katz Dep. at 745–66. Among other things, Katz refused to reveal polling numbers taken by his mayoral campaign that could have indicated damage to his political career, refused to answer any questions premised on the damages he would suffer if he lost the mayoral race, refused to discuss any personal damages, refused to delineate between "political" and "business" damages, and refused to answer several hypothetical questions despite acknowledging that all of his "business damages" were premised on a hypothetical inability to raise capital in the future.

86. In a prior oral decision granting a motion to unseal the record, I also cited other factors that are arguably relevant here. These include Katz's conscious decision to speak about the lawsuit publicly and assertively (calling the plaintiffs "shakedown artists") rather than promptly seeking to seal the complaint within the first days of the dispute. Katz also testified at a deposition in another case involving CSP and did not seek to place the deposition under seal even though it dealt with issues similar to this lawsuit. At one point, Katz even attributed his inability to answer questions about this lawsuit to a gag order supposedly entered by this court, even though no such order was entered. Although Katz claims that once the complaint was filed, he had to mitigate the injury to himself by discussing the case with the media and third parties, Katz's willingness to file his answer publicly and his public statements attacking the integrity of the plaintiffs, while understandable as a campaign tactic, do not support a rational inference that he viewed any aspect of this suit as being commercially or personally sensitive in the traditional ways that might give rise to a judicial order permitting the sealing of aspects of a record, but rather suggest that he viewed any accusation of wrongdoing directed at himself as something he desired to keep out of the public's view because it might compromise his political and commercial ambitions.